PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 18-2797 & 18-3124

_____

CRYSTALLEX INTERNATIONAL CORPORATION

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

PETROLEOS DE VENEZUELA, S.A. (Intervenor in D.C.),
                                                    Appellant

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-17-mc-00151)
District Judge: Honorable Leonard P. Stark

_____

No. 18-2889

_____

In re:  PETROLEOS DE VENEZUELA, S.A.,
                                                    Petitioner

———————

On Petition for Writ of Mandamus
from the United States District Court
for the District of Delaware
(Related to D.C. Civil Action No. 1-17-mc-00151)

———————

Argued April 15, 2019

Before: AMBRO, GREENAWAY, JR.,
and SCIRICA, Circuit Judges

(Opinion filed: July 29, 2019)

Samuel Taylor Hirzel, II
Heyman Enerio Gattuso & Hirzel
300 Delaware Avenue, Suite 200
Wilmington, DE  19801

Kevin A. Meehan
Julia Mosse
Juan O. Perla
Joseph D. Pizzurro (Argued)
Curtis Mallet-Prevost Colt & Mosle
101 Park Avenue, 35th Floor
New York, NY  10178

        Counsel for Intervenor-Appellant

Miguel A. Estrada (Argued)
Matthew S. Rozen

Lucas C. Townsend
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC  20036

Rahim Moloo
Jason W. Myatt
Robert L. Weigel
Gibson Dunn & Crutcher
200 Park Avenue, 47th Floor
New York, NY  10166

Travis S. Hunter
Jeffrey L. Moyer
Raymond J. DiCamillo
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE  19801

Counsel for Appellee

E. Whitney Debevoise, II
Stephen K. Wirth
Samuel F. Callahn
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC  20001

Paul J. Fishman
Arnold & Porter Kaye Scholer LLP
One Gateway Center, Suite 1025
Newark, NJ  07102

Kent A. Yalowitz (Argued)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY  10019

      Counsel for Intervenor-Appellant
      Bolivarian Republic of Venezuela

Amanda F. Davidoff (Argued)
Sullivan & Cromwell LLP
1700 New York Avenue, N.W., Suite 700
Washington, DC  20006

Sergio Galvis
Joseph E. Neuhaus
Andrew G. Ditderich
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

Carl N. Kunz, III
Lewis H. Lazarus
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801

      Counsel for Amicus Appellants
      Blackrock Financial Management Inc.;
      Contrarian Capital Management LLC

***

## OPINION OF THE COURT

***

AMBRO, <u>Circuit Judge</u>

Crystallex International Corp., a Canadian gold mining company, invested hundreds of millions of dollars to develop gold deposits in the Bolivarian Republic of Venezuela. In 2011, Venezuela expropriated those deposits and transferred them to its state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA"). To seek redress, Crystallex invoked a bilateral investment treaty between Canada and Venezuela to file for arbitration before the International Centre for Settlement of Investment Disputes. The arbitration took place in Washington, D.C., and Crystallex won; the arbitration panel awarded it $1.2 billion plus interest for Venezuela's expropriation of its investment. The United States District Court for the District of Columbia confirmed that award and issued a $1.4 billion federal judgment. Now Crystallex is trying to collect.

Unable to identify Venezuelan-held commercial assets in the United States that it can lawfully seize, Crystallex went after U.S.-based assets of PDVSA. Specifically, it sought to attach PDVSA's shares in Petróleos de Venezuela Holding, Inc. ("PDVH"), its wholly owned U.S. subsidiary. PDVH is the holding company for CITGO Holding, Inc., which in turn owns CITGO Petroleum Corp. ("CITGO"), a Delaware Corporation headquartered in Texas (though best known for the CITGO sign outside Fenway Park in Boston).

5

This attachment suit is governed by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–1611 (the "Sovereign Immunities Act"). Under federal common law first recognized by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), a judgment creditor of a foreign sovereign may look to the sovereign's instrumentality for satisfaction when it is "so extensively controlled by its owner that a relationship of principal and agent is created." *Id.* at 629.

Interpreting *Bancec*, the District Court, per Chief Judge Stark, concluded that Venezuela's control over PDVSA was sufficient to allow Crystallex to attach PDVSA's shares of PDVH in satisfaction of its judgment against the country. PDVSA and Venezuela, along with PDVSA's third-party bondholders as *amici* (the "Bondholders"), challenge this ruling.

Venezuela and the Bondholders do not substantially contest the District Court's finding that it extensively controlled PDVSA. Rather, they raise various jurisdictional and equitable objections to the attachment. Likewise, PDVSA primarily contends that its tangential role in the dispute precludes execution against its assets under *Bancec* irrespective of the control Venezuela exerts over it.

We affirm the District Court's order granting the writ of attachment and remand for further proceedings consistent with this opinion.[1]

---

[1] We also deny PDVSA's petition for a writ of mandamus and dismiss as moot its second appeal.

6

## I.    Background

### A. Factual background

In 2002, Crystallex contracted with Corporación Venezolana de Guayanaan, an organ of the Venezuelan government, for the right to develop and extract exclusively for 20 years the gold deposits at Las Cristinas, Venezuela. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela* ("*D.C. Crystallex I*"), 244 F. Supp. 3d 100, 105–06 (D.D.C. 2017). The deposits are among the world's largest. Per the contract, Crystallex spent hundreds of millions of dollars developing the Las Cristinas site. *Id.* at 106. It also performed various other obligations under the contract. *Id.*

In 2011, Venezuela nationalized its gold mines and seized the Las Cristinas works without providing compensation. As Crystallex asserts and PDVSA does not dispute, Venezuela then gave the mining rights at Las Cristinas to PDVSA for no consideration, and PDVSA subsequently "sold to the Venezuelan Central Bank 40% of its shares in the affiliate that was created to exercise those mining rights." J.A. 1194.

Later that year, Crystallex filed for arbitration under a bilateral investment treaty between Canada and Venezuela before the International Centre for Settlement of Investment Disputes. As noted earlier, the arbitration took place in Washington, D.C., and Crystallex won an arbitration award of $1.2 billion plus interest.

Crystallex had its award. Now it had to collect.

7

### B. Crystallex's collection efforts

#### 1. Confirmation proceedings in the District of Columbia

Crystallex filed an action to confirm its award in the U.S. District Court for the District of Columbia. It properly served Venezuela, who appeared to defend it. The Court confirmed the award and entered a federal judgment in favor of Crystallex. *D.C. Crystallex I*, 244 F. Supp. 3d at 122–23. After Venezuela failed to satisfy the judgment within 30 days, the Court ruled that Crystallex could execute on it. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. CV 16-0661 (RC), 2017 WL 6349729, at *1 (D.D.C. June 9, 2017). However, the Court expressly declined to address whether Crystallex could attach assets held by PDVSA and its subsidiaries. *Id.* at *2. Venezuela appealed the ruling, and the D.C. Circuit affirmed it. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-7068, 2019 WL 668270, at *2 (D.C. Cir. Feb. 14, 2019).

#### 2. Delaware Uniform Fraudulent Transfer Act proceedings

While arbitration was pending and then after the award was announced, Crystallex brought suits against CITGO, CITGO Holding, PDVH, and PDVSA in the Delaware District Court. *See Crystallex Int'l Corp. v. PDV Holding, Inc.* (1:15-CV-1082); *Crystallex Int'l Corp. v. PDV Holding, Inc.* (1:16-CV-1007). It claimed that Venezuela refused to pay its arbitration award and "thwart[ed] enforcement" by transferring its assets among several entities—PDVSA, PDVH, and CITGO— allegedly in violation of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1301–11. *Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79, 82 (3d Cir. 2018). The Court denied PDVH's motion to dismiss, but

8

we reversed and held that a transfer from a non-debtor could not be a "fraudulent transfer" under the Act. *Id.* at 81 ("While we do not condone the debtor's and the transferor's actions, we must conclude that Crystallex has failed to state a claim under [the Act]."). That panel noted explicitly but reserved judgment on the question now before us—whether PDVSA could be liable for the arbitration award as an "alter ego" of Venezuela. *Id.* at 84 n.7.

### 3.      Proceedings in this appeal

While the award-confirmation appeal was pending in the D.C. Circuit, Crystallex followed up its judgment by filing an attachment action against Venezuela in the Delaware District Court. Under Federal Rule of Civil Procedure 69(a), Crystallex attempted to attach PDVH shares owned by PDVSA. That rule provides: "A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located," here Delaware, "but a federal statute governs to the extent it applies." Delaware law permits a judgment creditor to obtain a writ of attachment (known by its Latin name, *fieri facias*, or simply *fi. fa.*) over various forms of property belonging to the debtor, including its shares in a Delaware corporation. *See* 10 Del. C. § 5031; 8 Del. C. § 324(a).

Though not named in the attachment proceeding, PDVSA intervened in the District Court. It moved to dismiss the proceeding on the ground of sovereign immunity under the Sovereign Immunities Act.

After several rounds of briefing and hearings, the District Court concluded that PDVSA was Venezuela's "alter ego" under *Bancec*. *Crystallex Int'l Corp. v. Bolivarian*

9

*Republic of Venezuela* ("*Del. Crystallex*"), 333 F. Supp. 3d 380, 414 (D. Del. 2018). The Court held (1) it had jurisdiction to order attachment against PDVSA's U.S.-based commercial assets, and (2) Crystallex could attach PDVSA's shares of PDVH to satisfy the judgment against Venezuela. A follow-up order, dated August 23, 2018, directed the Clerk to issue the writ and have it served in furtherance of an execution through a public sale of PDVH stock. PDVSA appealed both of these orders (docketed in our Court as Nos. 18-2797 & 18-3124), and also filed a petition for a writ of mandamus (No. 18-2889) to prevent completion of the sale during this appeal. We consolidated all three appeals for oral argument and resolution.

While they were pending before us, Venezuela moved to intervene and to stay these appeals for 120 days so that it could further evaluate its legal position. By order dated March 20, 2019, we granted Venezuela's motion to intervene and participate in oral argument. We also permitted it to file supplemental briefing. We did not rule on its motion to stay but stated we would consider that motion at oral argument. At that argument, Venezuela chose to forgo further pursuit of a stay. Oral Arg. Tr. at 180:1–7 (Apr. 15, 2019).

## C. Relationship between Venezuela and PDVSA

The District Court's primary ruling was that PDVSA is Venezuela's "alter ego" under *Bancec*. Numerous facts are relevant to that determination, as discussed in more detail below. In general, it is undisputed the relationship between PDVSA and Venezuela has tightened significantly since 2002, when then-President Hugo Chávez fired roughly 40% of the PDVSA workforce for protesting increased Venezuelan control over the company. Since then PDVSA's presidents have generally been senior members of the Venezuelan president's cabinet, including members of the Venezuelan military. Venezuela has also passed various laws that require

10

PDVSA to fund both government initiatives and discretionary government funds. Venezuela controls PDVSA's domestic oil production, sales, and pricing. It also requires that PDVSA supply Venezuela and its strategic allies with oil at below-market rates.

### D. The Bondholders' interests

Also relevant to this appeal are the various bonds that PDVSA has issued over the past decade or so. Several holders of PDVSA bonds due to mature in 2020 moved to intervene as *amici* in this appeal. They include BlackRock Financial Management, Inc. and Contrarian Capital Management, LLC. Their bonds have an outstanding face value of approximately $1.684 billion and are secured by a 50.1% collateral interest in PDVH's shares of Citgo Holding, Inc. as security for the bonds. According to the Bondholders, PDVSA has also issued roughly $25 billion in bonds to U.S. and non-U.S. capital markets investors.

### E. U.S. policy towards Venezuela and PDVSA

President Nicolas Maduro became the President of Venezuela in 2013. This year Juan Guaidó, Venezuelan's opposition leader and president of the National Assembly, has made efforts to oust Maduro and take control of the Venezuelan government. The United States Government recognized Guaidó as the rightful leader of Venezuela on January 23, 2019.[2]

---

[2] As a practical matter, there is reason to believe that Guaidó's regime does not have meaningful control over Venezuela or its principal instrumentalities such as PDVSA. Nonetheless, under *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138

11

Five days later, as part of a broader effort to convince the Maduro regime to cede power, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") imposed new sanctions against PDVSA by adding it to the List of Specially Designated Nationals and Blocked Persons. As discussed further below, the U.S. Government has also promulgated several executive orders limiting transfer of Venezuelan or PDVSA-controlled assets in the United States.

## II.    Jurisdiction and standard of review

The parties dispute whether the District Court had jurisdiction to attach PDVSA's property to satisfy the judgment against Venezuela. The Court held that it had both ancillary jurisdiction to enforce the judgment and an independent basis for jurisdiction per 28 U.S.C. § 1330 and 28 U.S.C. § 1605(a)(6) because PDVSA was Venezuela's alter ego. Section 1330 grants federal-court jurisdiction over "any nonjury civil action" against a foreign sovereign, so long as the sovereign is properly served under 28 U.S.C. § 1608 and is not entitled to sovereign immunity. *See* 28 U.S.C. § 1330(a)–(b). Under 28 U.S.C. § 1604, foreign sovereigns and their instrumentalities are entitled to sovereign immunity in U.S. courts except as provided in 28 U.S.C. §§ 1605–1607. Section 1605(a)(6), the immunity exception applied by the District Court in this case, provides an exception to immunity for actions seeking to compel arbitration pursuant to an agreement or to enforce arbitration awards that meet certain criteria.

We have jurisdiction to review the District Court's denial of PDVSA's motion to dismiss as an immune sovereign

---

(1938), we recognize Guaidó's regime as authorized to speak and act on behalf of Venezuela in these appeals.

and the grant of Crystallex's motion for a writ of attachment under Federal Rule of Civil Procedure 69. We have jurisdiction to review the former under the collateral order doctrine. *See Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1279–82 (3d Cir. 1993).[3] Our jurisdiction exists for the latter because it amounted to a final judgment under 28 U.S.C. § 1291 by leaving the District Court "nothing left to do but execute[.]" *Bryan v. Erie Cnty. Office of Children and Youth*, 752 F.3d 316, 321 (3d Cir. 2014).

We review questions of law *de novo* and findings of fact for clear error, and we review *de novo* the ultimate determination whether to treat PDVSA as Venezuela's alter ego. *See Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 575 (3d Cir. 2018).

## III. Analysis

The parties raise a host of issues. We group them into three core inquiries: (A) whether the *Bancec* "alter ego" doctrine determines the District Court's jurisdiction to attach PDVSA's assets (it does), (B) the scope of the *Bancec* inquiry and whether its factors are satisfied here (they are), and (C)

---

[3] The collateral order doctrine allows us to exercise jurisdiction over interlocutory appeals, such as this one, when the order "conclusively determines the disputed question, resolves an important issue completely separate from the merits of the action, and is effectively unreviewable on appeal from a final judgment." *Fed. Ins. Co.*, 12 F.3d at 1279–80 (brackets and internal quotation marks omitted); *see also Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545–47 (1949) (articulating the doctrine).

13

whether PDVSA's shares of PDVH are immune from attachment under the Sovereign Immunities Act (they are not).

### A. *Bancec* controls the jurisdictional inquiry here.

#### 1. The District Court had jurisdiction over Venezuela.

As noted, Crystallex confirmed its arbitration award against Venezuela in the U.S. District Court for the District of Columbia, which yielded a federal judgment. It then registered that judgment for enforcement in the Delaware District Court under 28 U.S.C. § 1963. That section provides that a judgment so registered "shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." *Id.* After registering the judgment, Crystallex moved to enforce it by attaching assets under Federal Rule of Civil Procedure 69(a).

As a threshold question, we consider whether the District Court in Delaware had jurisdiction over Venezuela, the only party named as a defendant here. It is undisputed that the D.C. District Court had jurisdiction over Venezuela under the Sovereign Immunity Act's arbitration exception, 28 U.S.C. § 1605(a)(6). It is well established that federal courts have ancillary jurisdiction to enforce their judgments. *See IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 311 (3d Cir. 2006). That jurisdiction applies to "a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment . . . [and] garnishment." *Peacock v. Thomas*, 516 U.S. 349, 356, 359 & n.7 (1996). Furthermore, ancillary enforcement jurisdiction—or its functional equivalent—has been routinely applied to post-judgment enforcement proceedings against a foreign sovereign. *See First City, Texas Houston, N.A. v. Rafidain*

14

*Bank*, 281 F.3d 48, 53–54 (2d Cir. 2002); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1123 (9th Cir. 2010); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 150 (D.C. Cir. 1994). In other words, when a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment—here, the exception for confirming arbitration awards, 28 U.S.C. § 1605(a)(6)—that party does not need to establish yet another exception when it registers the judgment in another district court under 28 U.S.C. § 1963 and seeks enforcement in that court. Rather, the exception in the merits action "sustain[s] the court's jurisdiction through proceedings to aid collection of a money judgment rendered in the case . . . ." *First City*, 281 F.3d at 53–54.

According to Venezuela, we should forbid Crystallex from using the § 1963 procedure in this case, as that procedure for registering a judgment cannot be applied to a foreign sovereign at all because it is "preempted by [the Sovereign Immunities Act]." (Venezuela Br. at 9–16.)[4] Venezuela presents this position as a two-pronged jurisdictional argument. First, it contends that § 1963 does not confer personal jurisdiction over it because the only method for establishing jurisdiction is by making proper service under the Sovereign Immunities Act's service provisions, 28 U.S.C. § 1608. (Venezuela Br. at 9–12.) We disagree: § 1608 applies only to the "summons and complaint," *id.*, whereas "[s]ervice of post-judgment motions is not required." *Peterson*, 627 F.3d at 1130.

Second, Venezuela asserts that § 1963 does not create subject matter jurisdiction over foreign sovereigns and cannot

---

[4] We note that, as a doctrinal matter, "preemption" generally refers to the effect of a federal statute on state law rather than on other federal statutes.

be used to "piggyback" on the subject-matter jurisdiction of the court that rendered the judgment being enforced. (Venezuela Br. at 12–16.) Regardless whether § 1963 separately confers subject-matter jurisdiction over foreign sovereigns, a district court has jurisdiction to enforce a federal judgment against a foreign sovereign when it is registered under § 1963. This is so, as noted, because the jurisdictional basis from the action resulting in the judgment carries over to the post-judgment enforcement proceeding in a manner akin to the ordinary operation of a district court's enforcement jurisdiction over post-judgment proceedings. *See First City*, 281 F.3d at 53–54; *Peterson*, 627 F.3d at 1123; *Transaero*, 30 F.3d at 150.

A recent decision by the Supreme Court reinforces our rejection of Venezuela's novel § 1963 argument. *See Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1054 (2019). It involved a § 1963 proceeding against the instrumentalities of a foreign sovereign—the same procedural posture we have here. The Court resolved that case on a ground not relevant here, but, notably, it expressed no concern about the use of a § 1963 proceeding against a foreign sovereign. If Venezuela's view of § 1963 were correct, *Harrison* would presumably have said so.[5]

In short, before the Delaware District Court and us is a continuation of the action in the D.C. District Court. As the latter had jurisdiction over Venezuela—by virtue of the Sovereign Immunities Act's arbitration exception, 28 U.S.C. § 1605(a)(6)—both Courts that follow, the Delaware District Court and our Court, also have jurisdiction.

---

[5] Indeed, Justice Thomas would have affirmed the Second Circuit's exercise of jurisdiction—implicitly concluding there was no § 1963 jurisdictional problem. *Id.* at 1066 (Thomas, J., dissenting).

16

## 2. The District Court properly used *Bancec* to extend its jurisdiction to assets held nominally by PDVSA.

Taking a different tack, PDVSA concedes the District Court had jurisdiction over Venezuela but believes that *Bancec* cannot be used to extend that jurisdiction to reach the assets of PDVSA, a non-party to the merits action. We part company again.

To reach this conclusion, we first consider our decision in *Federal Insurance*, 12 F.3d at 1287. There we joined other circuits in holding that, although the *Bancec* doctrine came in a case involving the shifting of substantive liability, it also applied to extend a district court's jurisdiction over a foreign sovereign to reach an extensively controlled instrumentality. *See id.* (collecting cases). On a straightforward application of *Federal Insurance*, the District Court's jurisdiction over Venezuela would extend to PDVSA so long as it is Venezuela's alter ego under *Bancec*. *See De Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir. 1984) (applying *Bancec* in post-judgment enforcement proceeding); *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.,* 183 F.3d 1277, 1288 (11th Cir. 1999) (same).

That potential application of *Federal Insurance* deserves a closer look. The decision was in the context of a merits action—it did not address the post-judgment enforcement setting we have here. 12 F.3d at 1287. According to PDVSA, that distinction makes all the difference. It claims that a district court cannot exercise post-judgment enforcement jurisdiction over a party other than the judgment debtor based

17

on a theory of "alter ego" or "veil piercing"[6] unless it has an "independent basis" for jurisdiction over the third party. (PDVSA Br. at 24–27.)  For that proposition, PDVSA cites *Peacock*, 516 U.S. at 357, in which a plaintiff who had obtained a federal judgment against his employer under the Employee Retirement Income Security Act of 1974 ("ERISA") filed a new action in a federal court against a shareholder of the employer seeking to hold him liable by "piercing the corporate veil."  *Id.* at 353.  The Court ruled that action was not within the district court's ancillary enforcement jurisdiction because it does not extend to "a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."  *Id.* at 357.

According to PDVSA, *Peacock* precludes the District Court from exercising ancillary enforcement jurisdiction over this action because it seeks to "shift liability for payment of an existing judgment to a third party that is not otherwise liable on the judgment."  (PDVSA Br. at 24 (citing *Peacock*).)  That reading of *Peacock* misfires.  It was not a case involving foreign sovereigns or the Sovereign Immunities Act.  The Act is a specialized jurisdictional statute designed to address a specific problem—the extent to which foreign sovereigns and their instrumentalities are immune from suit and attachment in our courts.  And the *Bancec* doctrine—the applicability of which is the core question here—is a federal common-law outgrowth of that specialized statute.  It (the doctrine) exists specifically to enable federal courts, in certain circumstances, to disregard the corporate separateness of foreign sovereigns to

---

[6] These terms in legal context mean that if an entity's separate form (typically as a subsidiary corporation) is so disregarded by the one who controls it (the "parent"), the "corporate veil" can be "pierced," that is, separateness is ignored.

18

avoid the unfair results from a rote application of the immunity provisions provided by the Sovereign Immunities Act. Nothing in *Peacock* leads us to believe the Supreme Court expected or intended its decision in that case to restrain the application of *Bancec* in post-judgment proceedings.

Moreover, in *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018), the Supreme Court all but confirmed that *Bancec* can indeed be used to reach the assets of a foreign sovereign's extensively controlled instrumentality through post-judgment attachment proceedings. The Court examined 28 U.S.C. § 1610(g), a provision of the Sovereign Immunities Act related to attachments of assets held by agencies and instrumentalities of states that have sponsored terrorism. *Id.* It observed that § 1610(g)(1), which was added to the Sovereign Immunities Act by congressional amendment in 2008, "incorporate[s] almost verbatim the five *Bancec* factors [they are noted below], leaving no dispute that, at a minimum, § 1610(g) serves to abrogate *Bancec* with respect to the liability of agencies and instrumentalities of a foreign state where a [terrorism-related-judgment] holder seeks to satisfy a judgment held against the foreign state." *Id.* We take from this the implication that in *ordinary* FSIA attachment proceedings—*i.e.*, those that do not involve judgments based on state-sponsored terrorism—the judgment holder may reach the assets of the foreign judgment debtor by satisfying the *Bancec* factors. *See id.* Indeed, the Court expressly stated that, where 28 U.S.C. § 1610(g) does not apply, a plaintiff with a judgment against the sovereign would need to satisfy the *Bancec* factors if it sought, for example, "to collect against assets located in the United States of a *state-owned telecommunications company*." *Id.* at 23–24 (citing *Alejandre*, 183 F.3d 1277) (emphasis added).

These analyses confirm the relevance of *Bancec* here: so long as PDVSA is Venezuela's alter ego under *Bancec*, the

19

District Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country. *See Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563–65 (11th Cir. 1987) (looking to the Sovereign Immunities Act and *Bancec* to determine "whether the assets of a foreign state's wholly-owned national airline are subject to execution to satisfy a judgment obtained against the foreign state, where the airline was neither a party to the litigation nor was in any way connected with the underlying transaction giving rise to the suit"); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 532–38 (5th Cir. 1992) (doing the same to determine whether the district court had jurisdiction to conduct a garnishment proceeding against a foreign instrumentality, where the purported basis for jurisdiction was solely the actions of the instrumentality's agents).

## B. Whether Venezuela is PDVSA's alter ego under *Bancec*

"Due respect for the actions taken by foreign sovereigns and for principles of comity between nations" caused the Supreme Court to conclude in *Bancec* that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." 462 U.S. at 626–27. Recognizing the respect due to foreign sovereigns, the Court adopted a "presumption of independent status" for instrumentalities. *Id.* at 627. PDVSA, as an instrumentality of Venezuela separately formed in 1976, is accorded that presumption. It is not to be taken lightly, as the District Court noted. *Del. Crystallex*, 333 F. Supp. 3d at 396 (D. Del. 2018) (citing *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir. 2016)); *see also De Letelier*, 748 F.2d at 795 ("[B]oth *Bancec* and the [Sovereign Immunities Act's] legislative history caution against too easily overcoming the presumption of separateness.").

20

## 1. Extensive control standard under *Bancec*

In *Bancec* the Supreme Court allowed a U.S. bank to recover assets from a Cuban instrumentality to satisfy a debt owed by the Republic of Cuba. *Bancec*, 462 U.S. at 613. It held that while there exists a strong presumption that government instrumentalities have a separate legal identity (along with limited liability) from their "parent" governments, this presumption can be overcome in certain situations—for example, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Bancec*, 462 U.S. at 629 (citing *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402–404 (1960)). "In addition," it recognized "the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Id.* (quoting *Taylor v. Standard Gas Co.*, 306 U.S. 307, 322 (1939)). Thus we recognize *Bancec* establishes a disjunctive test for when the separate identities of sovereign and instrumentality should be disregarded: when there is "extensive[] control," and when not disregarding separate identities would work a "fraud or injustice." *Rubin*, 138 S. Ct. at 823.

*Bancec* did not develop a "mechanical formula" for determining when these exceptions should apply, however, which left "lower courts with the task of assessing the availability of exceptions on a case-by-case basis." *Rubin*, 138 S. Ct. at 823. In ensuing decades district and circuit courts applied the *Bancec* extensive-control test in various contexts. Several multi-factor tests emerged in that period—the Second Circuit, for example, had a non-exhaustive five-factor test, *see EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d

21

78, 91 (2d Cir. 2015), which the District Court applied here.[7] By and large the multi-factor tests for extensive control percolating through the federal courts covered similar ground, *see, e.g.*, *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1380 n.7, 1381 (5th Cir. 1992) (identifying five extensive-control factors), though at least one court has piled on the factors, *see Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 418 (5th Cir. 2006) (recognizing 21 factors relevant to extensive control);

In *Rubin*, the Supreme Court recently provided a further gloss on the *Bancec* factors, which we believe clarifies the analysis of the extensive-control prong here. The plaintiffs there held a § 1605A-judgment against the Islamic Republic of Iran and attempted to attach and execute against certain Iranian artifacts on loan to the University of Chicago. *Rubin*, 138 S. Ct. at 820. In the course of addressing whether that attachment

---

[7] These factors include:

> whether the sovereign nation: (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.

*EM Ltd.*, 800 F.3d at 91; *Del. Crystallex*, 333 F. Supp. 3d at 401.

22

was proper (it was not), the Court identified five "*Bancec* factors" to aid circuit courts in their analysis:

> (1) the level of economic control by the government;
>
> (2) whether the entity's profits go to the government;
>
> (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;
>
> (4) whether the government is the real beneficiary of the entity's conduct; and
>
> (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Id.* at 823 (quoting *Walter Fuller Aircraft Sales, Inc.*, 965 F.2d at 1380 n.7). We use these factors identified in *Rubin* to structure our analysis here. At the same time, we recognize that they, like the other extensive control tests our sister circuits have adopted,[8] are meant to aid case-by-case analysis rather

---

[8] We follow Crystallex's suggestion to apply the *Rubin* factors, and neither Venezuela nor PDVSA indicates a preference between them and those the District Court applied. Either inquiry compels the same result. *See generally Del. Crystallex*, 333 F. Supp. 3d at 406–14. But an unresolved point of ambiguity remains: whether the *Rubin* factors apply only to the extensive-control inquiry (as in *Walter Fuller*) or to both disjunctive tests. The parties do not address this issue, and so we leave it for a future panel.

than establish a "mechanical formula" for identifying extensive control. *Bancec*, 462 U.S. at 633.

### 2. *Bancec*'s scope

PDVSA and the Bondholders raise together six challenges to the District Court's inquiry under *Bancec*: that (i) a sovereign's extensive control, alone, cannot allow courts to ignore the separateness of a corporation from the country it is in, (ii) Crystallex must show PDVSA acted as Venezuela's agent against Crystallex, (iii) we must consider the third-party interests of PDVSA's bondholders, (iv) extensive control must be shown by clear and convincing evidence, (v) the *Bancec* inquiry must be examined in light of current circumstances, particularly the limited control of the Guaidó regime over PDVSA; and (vi) *Bancec* requires that courts also balance equities when they consider whether to discard an instrumentality's presumption of separateness. We address each argument in turn.

### i. Bancec's extensive control prong does not require a nexus between the plaintiff's injury and the instrumentality.

PDVSA contends that there must be some connection between the sovereign's abuse of its instrumentality's corporate form and the plaintiff's injury. Indeed PDVSA declined our numerous invitations at oral argument to argue that any of the extensive control factors cut against Crystallex's position. It reiterated its position that each is irrelevant here because Crystallex also needed to show that PDVSA did something to cause the plaintiff's injury. Oral Arg. Tr. at 97:22–104:12 (Apr. 15, 2019). We differ.

First, though *Bancec* involved the "fraud or injustice" prong rather than the "extensive control" prong, no nexus existed between the dominated instrumentality and the plaintiff's injury. Cuba had established in 1960 Banco Para El Comercio Exterior de Cuba (Bancec), "[a]n official autonomous credit institution for foreign trade . . . with full juridical capacity . . . of its own . . . ." *Bancec*, 462 U.S. at 613. Bancec was a creditor of Citibank and sued the bank to collect on a letter of credit. Days later, the Cuban government seized all of Citibank's Cuba-based assets. *Id.* It also dissolved Bancec after that proceeding began, and the remainder of its case was handled by the Cuban Ministry of Foreign Trade. *Id.* at 615. Despite no link between Bancec and Cuba's seizure of Citibank's assets, the Supreme Court held Citibank could offset its debt to Bancec with the value of the expropriated assets. "Giving effect to Bancec's separate juridical status in these circumstances" would cause an injustice. *Id.* at 632. In recounting the case's history, the Court also expressly noted that the Second Circuit, from where the case came, had applied a nexus requirement and then did not adopt one itself. *See id.* at 619 (quoting the Second Circuit as saying the presumption of separate identities may be overcome only "when the subject matter of the counterclaim assertible against the state is state conduct in which the instrumentality had a key role").

Like *Bancec*, not a single factor recognized in *Rubin* suggests any link between the dominated instrumentality and the injury to the plaintiff. The *Rubin* Court's brief discussion of the hypothetical plaintiff seeking to collect against "the assets located in the United States of a state-owned telecommunications company," and citation to *Alejandre* (which in turn involved no connection between the telecommunications agency and the plaintiff's injury), likewise suggest no tying requirement. *Rubin*, 138 S. Ct. at 824. Similarly, the vast majority of circuits have required no link between the abuse of the corporate form and the plaintiff's

injury under the first *Bancec* path for veil-piercing.  *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 478 (2d Cir. 2007); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1071–73 (9th Cir. 2002); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000); *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 565 (11th Cir. 1987).[9]

Second, as Crystallex observes, requiring an independent nexus requirement would likely read the *Bancec* extensive-control test out of the doctrine.  When pressed at oral argument to identify the circumstances where *Bancec* could be applied, PDVSA offered two: under *Bancec*'s "fraud or injustice" prong (*i.e.*, where a sovereign uses its instrumentality's separate status to perpetuate a fraud or injustice) or where the instrumentality was itself "responsible on the arbitration award as a participant in the events."  Oral Arg. Tr. at 91: 7–18.  But if the instrumentality were directly liable for the award, there would be no need to invoke *Bancec* at all.  PDVSA thus tries to read the extensive control prong out of *Bancec*.  We cannot.

The District Court concluded correctly that *Bancec* does not require a connection between a sovereign's extensive control of its instrumentality and the plaintiff's injury.  Control

---

[9] One panel of the Fifth Circuit has suggested that *Bancec*'s alter ego standards are the same as common state-law requirements, many of which include a nexus requirement. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006). *But see First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 752–53 (5th Cir. 2012), *as revised* (Jan. 17, 2013).

alone, if sufficiently extensive, is an adequate basis to disregard an instrumentality's separate status.[10]

### ii. Bancec does not require a principal-agent relationship.

PDVSA also argues that the requirement in *Bancec* of extensive control such "that a relationship of principal and

---

[10] At oral argument, PDVSA stressed that *Bancec* clearly assumed for "extensive control" a connection between the abused form and the plaintiff's injury when it cited to the 1974 edition of *W.M. Fletcher, Cyclopedia of the Law of Private Corporations*. Oral Arg. Tr. at 77: 9–11 ("Fletcher says domination and control [are] not enough. You need to have an abuse of the form that results in an injury to the plaintiff."). But the excerpt *Bancec* quotes squarely contradicts such a narrow view: "[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." *Bancec*, 462 U.S. 611, 630 n.19 (quoting 1 *W.M. Fletcher, Cyclopedia of the Law of Private Corporations* § 41 (rev. perm. ed. 1974)). Further, *Bancec* does not even cite to *Fletcher* to support the proposition that extensive control can be sufficient to disregard corporate formalities. For this, it cited to *N.L.R.B. v. Deena Artware, Inc.*, 361 U.S. 398, 402 (1960), where the Court held that the National Labor Relations Board was entitled to seek discovery on an alternative theory of liability—"that these separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise.'" *Id.* at 402.

agent is created" requires the instrumentality to act as the sovereign's agent with respect to the events in dispute. *Bancec*, 462 U.S. at 629. Before *Rubin*, courts struggled with how to give meaning to *Bancec*'s apparent reference to a principal–agent relationship. *See, e.g.*, *Doe v. Holy See*, 557 F.3d 1066, 1080 (9th Cir. 2009). The most persuasive interpretation of the various approaches is by the D.C. Circuit, which recognized that "[c]ontrol by the sovereign is relevant in two distinct contexts[.]" *Transamerica Leasing*, 200 F.3d at 848. "First, . . . when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary." *Id.* "Second, . . . when the sovereign exercises its control in such a way as to make the instrumentality its agent; in that case control renders the sovereign amenable to suit under ordinary agency principles." *Id.* at 849. These examples of control are disjunctive. Only one method of domination needs to be shown, and Crystallex opts to pursue the former. Thus further discussion of a principal-agent relationship is not necessary.

### iii. Bancec does not require consideration of the third-party bondholders.

Amici bondholders of PDVSA contend *Bancec*'s extensive-control analysis requires consideration of the interests of other creditors of the judgment debtor's alleged alter ego, both as a matter of doctrine and of equity. That argument, plausible on its face, does not prevail here. As a doctrinal matter, the overarching framework of the extensive-control test tells us that third-party creditors' interest is a reason for—not a separate criterion of—the analysis. *Bancec* explained that those creditors' interests are part of the reason the presumption of separate juridical status is so difficult to overcome: "Freely ignoring the separate status of government instrumentalities would result in a substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy

28

a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee." 462 U.S. at 626. For that reason (among others), *Bancec* counsels courts not to ignore separate status. *See also De Letelier v. Republic of Chile*, 748 F.2d 790, 795 n.1 (2d Cir. 1984) (noting that abuse of the corporate form of the type identified in *Bancec* "must be clearly demonstrated to justify holding the 'subsidiary' liable for the debts of its sovereign 'parent,' particularly where, as here, LAN apparently has non-party private bank creditors"). To add to this analysis an additional unspecific consideration of third-party interests would double-count the creditors' concern in an arena of many competing concerns.

The difficulty of overcoming the *Bancec* presumption is also practical comfort: where there is extensive control, we can expect reasonable third parties to recognize the risks of extending credit. Here, for example, Venezuela's relationship to PDVSA was clearly disclosed to any prospective holder of the latter's bonds in the offering circular for that issuance: "We are controlled by the Venezuelan government"; obligations imposed by the government "may affect our . . . commercial affairs"; and "we cannot assure you that the Venezuelan government will not, in the future, impose further material commitments upon us or intervene in our commercial affairs." JA-608. Perhaps recognizing that risk, the Bondholders protected their extension of credit to PDVSA by obtaining as collateral a 50.1% security interest in PDVH's shares of Citgo Holding, Inc., which, of course, will not be impaired by the District Court's writ of attachment.

29

### iv. Timeframe: What is the appropriate point of reference for the extensive-control analysis?

Venezuela argues that the relevant time for a *Bancec* analysis of the relationship between a sovereign and its instrumentality is the moment the writ is issued. But it points to no authority for that proposition, and it does not explain why our review of the District Court's *Bancec* analysis would be any different than in the normal course, where we render our decision based on the record before the district court and "do[] not purport to deal with possible later events." *Standard Oil Co. v. United States*, 429 U.S. 17, 18 (1976) (*per curiam*); *Rubin*, 12 F.3d at 1284; *Fassett v. Delta Kappa Epsilon (New York)*, 807 F.2d 1150, 1165 (3d Cir. 1986). We follow the standard practice. On remand, Venezuela may direct to the District Court credible arguments to expand the record with later events.

### v. The burden of proof is preponderance of the evidence.

PDVSA contends that the District Court erred by reviewing the parties' evidence under a "preponderance of the evidence" rather than a "clear and convincing" burden of proof. We disagree, but also note that our decision as to the burden of proof has no effect on the outcome of our *Bancec* analysis; indeed, the implications of this question matter little to this appeal. PDVSA conceded as much at oral argument that our decision as to burden of proof has no effect on the outcome of our *Bancec* analysis. Oral Arg. Tr. at 95–96: 20–14 (Apr. 15, 2019).

PDVSA points to our ruling in *Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003), an ERISA veil-piercing case,

where at summary judgment we re-affirmed that "evidence justifying piercing the corporate veil must be 'clear and convincing.'" *Id.* (quoting *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994), *aff'd*, 514 U.S. 938 (1995)). Should this federal common law be applied here? We think not.

The Sovereign Immunities Act is the exclusive basis for finding jurisdiction in suits involving foreign sovereigns and instrumentalities, and *Bancec* is binding federal common law for disputes under the Act. Neither indicates that plaintiffs must show clear and convincing evidence, while many courts have applied a preponderance-of-the evidence standard to inquiries under it. *See, e.g.*, *Owens v. Republic of Sudan*, 864 F.3d 751, 784 (D.C. Cir. 2017); *Sachs v. Republic of Austria*, 737 F.3d 584, 589 (9th Cir. 2013), *rev'd on other grounds sub nom. OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015); *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000); *Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 472 (S.D.N.Y. 2017) (requiring preponderance of the evidence for *Bancec* inquiries); *First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd. of People's Republic of China*, 858 F. Supp. 2d 658, 668 n.54 (E.D. La. 2012) (also conducting a *Bancec* extensive control inquiry), *aff'd* 703 F.3d 742 (5th Cir. 2012); *In re 650 Fifth Ave. & Related Properties*, 881 F. Supp. 2d 533, 544 (S.D.N.Y. 2012) (same); *Kensington Int'l Ltd. v. Republic of Congo*, No. 03 CIV. 4578 LAP, 2007 WL 1032269, at *5 (S.D.N.Y. Mar. 30, 2007) (same). Further, no case cited by the parties suggests that the *Bancec* extensive-control inquiry requires clear and convincing evidence.

*Lutyk* drew from our Court's existing precedent holding that, where a plaintiff relies on a fraud theory for alter ego, it must be shown by clear and convincing evidence. *See Kaplan*, 19 F.3d at 1522. But here Crystallex does not attempt, nor

31

need, to satisfy an element of fraud.[11]  Further distinguishing *Lutyk* or *Kaplan*, it here seeks to survive a factual challenge under Rule 12(b)(1), which generally requires the plaintiff to establish jurisdiction by a preponderance of the evidence.  *See, e.g.*, *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

We also see scant policy reason to depart from existing caselaw and require plaintiffs to make a clear and convincing showing.  The difficulties of marshaling evidence sufficient to show a *Bancec* relationship present "a substantial obstacle to [Sovereign Immunities Act] plaintiffs' attempts to satisfy judgment." *Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 435 (D.D.C. 2012), *aff'd* 735 F.3d 934 (D.C. Cir. 2013).  In addition to the initial information imbalance between the judgment creditor and the foreign sovereign, the creditor must gather evidence related to events, witnesses, and relationships between a foreign sovereign and its own instrumentality, the bulk of which is often within the territorial control of the sovereign itself, making discovery a particularly onerous task.  Given the difficulties inherent in this evidence gathering,[12] the preponderance standard is "the measure of respect due foreign sovereigns."  *Bank of New York v. Yugoimport*, 745 F.3d 599, 614 (2d Cir. 2014).  A more onerous requirement would tip the balance too far in favor of

---

[11] Even if it did, as the Supreme Court has observed, the traditional state-law presumption in favor of clear and convincing evidence for fraud claims has not always extended to Congress, which frequently has required preponderance of the evidence for federal fraud claims.  *See Grogan v. Garner*, 498 U.S. 279, 288–89 (1991).

[12] The parties here rely chiefly on expert affidavits, publicly available corporate documents, and news articles.

the foreign sovereign at the expense of *Bancec*'s other core concern—ensuring that foreign states not dodge their obligations under international law. Thus we conclude that preponderance of the evidence is the appropriate burden of proof under *Bancec*.

### vi. Is there an equitable component to the "extensive control" prong of Bancec?

PDVSA proposes that an "equitable basis" is required "to rebut the presumption of separateness" under *Bancec*'s extensive-control prong. The District Court observed that even though *Bancec*'s two prongs are disjunctive, the extensive-control inquiry "inherently assumes that some element of unfairness would result if the Court fails to treat one entity as the alter ego of the other." *Del. Crystallex*, 333 F. Supp. 3d at 397 n.15. We need not determine whether this is an independent or necessary factor in an extensive-control inquiry. The test discussed in *Rubin* appears to treat it as such, and, as discussed below, it is easily satisfied here.

### C. Extensive control determination under *Bancec*

Having clarified the contours of the *Bancec* extensive-control inquiry, our applying that analysis here is straightforward. Though the factors the District Court applied differ slightly from those in *Rubin*, they are similar enough that its factual findings, which we review for clear error, direct the same result under either approach to the *Bancec* inquiry. While PDVSA effectively conceded that Crystallex satisfied each factor under *Rubin* at oral argument, we summarize the evidence for the sake of clarity, as the facts are paramount in determining when control is so extensive that entity separateness fades away as a legal distinction.

33

### 1. Factor 1: the level of economic control by the government

Venezuela wields extensive economic control over PDVSA. Venezuela's bondholder disclosures in 2011 and 2016 stated: "[G]iven that we are controlled by the Venezuelan government, we cannot assure you that [it] will not, in the future, impose further material commitments upon us or intervene in our commercial affairs in a manner that will adversely affect our operations, cash flow and financial results." JA-645; 1921. They leave no doubt Venezuela has the power to intervene and mandate PDVSA's economic policies. In 2011 PDVSA disclosed that "the Venezuelan government required us to acquire several electricity generation and distribution companies, as well as certain food companies . . . [,] and required . . . us to acquire the assets of [another Venezuelan company] at a price to be determined in the future." JA-608–09. The District Court found that Venezuela requires PDVSA to fund

> Venezuelan programs that have nothing to do with its business, causing PDVSA to take on additional debt. Such programs include PDVSA Agricola S.A., which subsidizes Venezuela's agriculture, industrial infrastructure, and produce sectors, and PDVSA Desarrollos Urbanos S.A., which subsidizes Venezuela's housing projects. . . . PDVSA's total contributions to the Venezuelan budget between 2010 and 2016 were in excess of $119 billion.

*Del. Crystallex*, 333 F. Supp. 3d at 409. In 2014 and 2015, PDVSA was required to contribute U.S. $974 million and U.S. $3.3 billion, respectively, to social programs and projects. *Id.*

34

As its 2011 offering circular to prospective bondholders explains, PDVSA's legal obligations stem in part from the Venezuelan constitution, which endows the State with significant control over PDVSA and the oil industry in the country. Article 12 provides hydrocarbon deposits within the territory of the state are the property of the Republic, JA-1722, and Article 302 reiterates "the State reserves to itself, through the pertinent organic law, and for reasons of national convenience, petroleum activity," *id.* at 1558. Article 303 addresses the state's control over PDVSA specifically: "For reasons of economic and political sovereignty and national strategy, the State shall retain all shares in Petroleos de Venezeula, S.A." *E.g.*, JA-350; 386. In addition, as PDVSA disclosed to bondholders, under Article 5 of the Organic Hydrocarbons Law, its revenues "are required to be used to finance health and education, to create funds for macroeconomic stabilization and to make productive investments, all in favor of the Venezuelan people. Those social commitments may affect our ability to place additional funds in reserve for future uses and, indirectly, our commercial affairs." *Id.* at 608.

The District Court also found that Venezuela exercises its economic control over PDVSA by dictating to whom PDVSA must sell oil to and at what price. The 2011 circular explains that "[t]he Venezuelan government, rather than the international market, determines the price of products . . . sold by us through our affiliates in the domestic market." *Id.* at 643. Thus Venezuela "dictates the severely discounted price at which PDVSA must sell its product to Venezuelan citizens" and "forces PDVSA to 'sell' oil to third parties for no, or *de minimis*, consideration." *Del. Crystallex*, 333 F. Supp. 3d at 408 (internal quotation marks and citations omitted). Per Venezuela's "Petrocaribe" agreements with its allies, PDVSA must provide oil to member states at a steep discount on price, along with a two-year grace period for payments, on a payment

35

schedule up to 25 years in length with interest rates as low as 1% (with the option, on Venezuela's part, to accept deferred payments directly in the form of goods and services). JA-928. Under the agreement, Venezuela "may acquire at preferential prices . . . sugar, bananas, or other goods or services to be determined, which are adversely affected by trade policies of rich countries." *Id.* In other words, as the District Court found, PDVSA provides oil while Venezuela maintains the right to accept payment. PDVSA's financial reports show that, from 2010 to 2016, it contributed approximately USD $ 77 billion under the Petrocaribe agreements. *Id.* at 1178.

The District Court wasn't finished: "Venezuela manipulates PDVSA's conversion of U.S. Dollars to Venezuelan Bolivars to leverage PDVSA's revenues. . . . PDVSA is required to convert foreign currency into Venezuelan Bolivars at an artificially low U.S. Dollar to Bolivar exchange rate (which is approximately 1/500th of the market rate)." *Del. Crystallex*, 333 F. Supp. 3d at 410 (internal quotation marks omitted).

Finally, Venezuela controls PDVSA's debt structure. Dr. Roberto Rigobon's supplemental declaration states that in November 2017 President Maduro decreed that Venezuela would restructure the external debt of both Venezuela and PDVSA. JA-2013. He also provided evidence that Venezuela made a $1.2 billion payment on a 2017 PDVSA bond. *Id.* at 2014.

### 2. Factor 2: whether the entity's profits go to the government

As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government. In addition, PDVSA pays Venezuela taxes and royalties on the oil it produces. The Rigobon Declaration contends that PDVSA pays

36

"extraordinary taxes," *i.e.*, taxes at an artificial rate designed to collect more of PDVSA's revenues. *Id.* at 1172.

### 3. Factor 3: the degree to which government officials manage the entity or otherwise have a hand in its daily affairs

The Venezuelan government exercises direct and extensive control over PDVSA. President Maduro appoints PDVSA's president, directors, vice-presidents, and members of its shareholder council. *Del. Crystallex*, 333 F. Supp. 3d at 407–08. Crystallex introduced a declaration from Jose Ignacio Hernandez, a Venezuelan legal academic, which notes that it has been "commonplace" since 2002 for PDVSA's president also to serve as Venezuela's oil minister. JA-1195. "This arrangement allowed the Government to control the daily operations of PDVSA." *Id.* PDVSA and Venezuela's Ministry of Petroleum and Mining share physical office space for its headquarters. *Id.* at 1196 & n.51. In a 2014 speech discussing the state of Venezuelan control over PDVSA since this reorganization, then-PDVSA President Rafael Ramirez Carreño, and the country's Vice Minister for Petroleum, stated that "we are one of the few oil producing countries in the world that has a strict and tight control over the sovereign management of its natural resources." *Id.* at 594.

The military increasingly exercises control over PDVSA. In November 2017, President Maduro appointed Major General Manuel Quevedo as Petroleum Minister and PDVSA president. *Id.* at 2018. Earlier that year, he also created a new post—Executive Vice-President of PDVSA— and appointed Vice-Admiral Maribel del Carmen Parra de Mestre to the position. *Id.* at 1198.

Venezuela has also wielded substantial influence over PDVSA's employees through a series of politically motivated

37

firings.  The highest profile of these occurred in 2002, when President Chávez fired roughly 40% of the PDVSA workforce in response to a strike protesting his regime.  *Id.* at 1054. Employees continue to face pressure from the state today.  The District Court found that, "[a]s recently as July 2017, Venezuela continued to threaten to terminate PDVSA employees who were opposed to the governing regime." *Del. Crystallex*, 333 F. Supp. 3d at 407.  Employees face pressure to attend Socialist Party rallies and have been threatened with termination unless they voted in elections.  *Id.* at 408.

### 4.    Factor 4:  whether the government is the real beneficiary of the entity's conduct

The District Court found that PDVSA's cheap oil to Venezuela's strategic allies also creates a mechanism whereby Venezuela extracts value from PDVSA's oil without paying the company.  "Venezuela also uses PDVSA to achieve its foreign policy goals by committing PDVSA to sell oil to certain Caribbean and Latin American nations at substantial discounts, without PDVSA's consent. . . . Even when those oil debts are repaid, the money is given to Venezuela, not PDVSA. . . ." *Id.* at 410.

PDVSA's actions with respect to this litigation also show how Venezuela is the real beneficiary of PDVSA's conduct.  For example, "it is undisputed that PDVSA paid the administrative fees Venezuela incurred in connection with the arbitration with Crystallex, which amounted to around $249,000." *Id.*  And, when Venezuela expropriated the La Cristinas mines, it gave to PDVSA for no consideration a number of mining rights, including rights in Las Cristinas that it had expropriated from Crystallex.  JA-1194.  This seamless transfer of value between PDVSA and Venezuela also suggests an alter ego relationship.

38

**5.** **Factor 5: whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations**

Venezuela owes Crystallex from a judgment that has been affirmed in our courts. Any outcome where Crystallex is not paid means that Venezuela has avoided its obligations. It is likewise clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system. Its 2020 bonds are backed by the common stock and underlying assets of U.S.-based corporations, and hence disputes stemming from default will be subject to U.S. laws and presumably be resolved through the U.S. legal system.[13] *See, e.g.*, Bayrock Exhibit 6 at 131–32, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, F. Supp. 3d 380 (D. Del. 2018), ECF No. 99-1. Indeed, it is probable the U.S. legal

---

[13] Crystallex has not identified any Venezuelan commercial assets in Delaware or the District of Columbia and may be unable to find satisfaction if attachment of PDVSA property is impermissible. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. CV 16-0661 (RC), 2017 WL 6349729, at *2 (D.D.C. June 9, 2017) ("Petitioner has been unable to identify any commercial assets belonging to [Respondent] in the District of Columbia but believes that Respondent possesses assets elsewhere in the United States, including in Delaware. . . . The assets Petitioner identifies are connected to Respondent through a variety of corporate structures . . .[,] in particular [Respondent's] indirect subsidiaries, PDVH, CITGO Holding, and CITGO Petroleum . . . .") (citations and internal quotations omitted).

system is the backstop that gives substantial assurance to investors who buy PDVSA's debt.

Nor does ignoring separate identities run against the equities here. PDVSA profited directly from Crystallex's injury: Venezuela transferred the rights to the expropriated mines to PDVSA for no consideration. Hence this factor too is satisfied.

### D. PDVSA's Shares of PDVH are attachable under the Sovereign Immunities Act.

Crystallex must also show that the particular property at issue in the attachment action—the PDVH stock—is not immune from attachment under the Sovereign Immunities Act. It provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution" unless one of the Act's statutory exceptions is met. 28 U.S.C. § 1609. The exception Crystallex invokes states that the "property in the United States of a foreign state . . ., *used for a commercial activity* in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States" based on an order confirming an arbitral award rendered against the foreign state. 28 U.S.C. § 1610(a)(6) (emphasis added).[14]

The Act defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an

---

[14] Section 1610(b) governs execution of a foreign instrumentality's property, but only section 1610(a) is relevant because the jurisdictional immunity is overcome for Venezuela, not PDVSA, who only enters the picture as Venezuela's alter ego.

activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 613 (1992), stated that the phrase "commercial activity" captures the "distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other." *Id.* "[W]hen a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the [Sovereign Immunities Act]." *Id.* at 614. Commercial actions include those that "(whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (quoting Black's Law Dictionary) (emphasis in original).[15]

PDVSA contends that the commercial activity exception requires current commercial use (*i.e.*, at the moment the writ is executed), which PDVSA contends is impeded by the current U.S. sanctions regime. There is some support for PDVSA's interpretation. *See Aurelius Capital Partners v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("[T]he property that is subject to attachment and execution must . . . have been 'used for a commercial activity' *at the time* the writ of attachment or execution is issued.") (emphasis in original). But narrowing the temporal inquiry to the day the writ is executed unnecessarily leaves room for manipulation, as any jurisdictional determination under the Sovereign Immunities Act is immediately appealable for interlocutory review, and courts (like the District Court here) may elect not to issue the writ alongside analysis of the jurisdictional and

---

[15] *Weltover* involved the commercial-activity exception to jurisdictional immunity, 28 U.S.C. § 1605(a), but its interpretation of "commercial" would apply equally here.

execution immunity. A strict day-of-writ inquiry could allow parties to avoid execution by freezing assets or otherwise ceasing commercial use when the appeal decision is handed down. Instead, a totality-of-the-circumstances inquiry seems more appropriate, as the Fifth Circuit aptly described: "This analysis should include an examination of the uses of the property in the past as well as all facts related to its present use, with an eye toward determining whether the commercial use of the property, if any, is so exceptional that it is 'an out of character' use for that particular property." *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 369 (5th Cir. 2004). And "it would be appropriate for a court to consider whether the use of the property in question was being manipulated by a sovereign nation to avoid being subject to garnishment under [the Sovereign Immunities Act]." *Id.* at 369 n.8.

But whether we apply the date the writ was issued—August 23, 2018—or the date of the August 9 opinion, PDVH shares are not immune from attachment. PDVSA argues that the shares cannot be used in commerce because they are subject of sanctions contained in two Executive Orders. *See* Exec. Order. No. 13835, 83 Fed. Reg. 24,001 (May 21, 2018) ("E.O. 13835"); Exec. Order No. 13808, 82 Fed. Reg. 41, 155 (Aug. 24, 2017) ("E.O. 13808").

This argument fails because the sanctions regime prohibits only some commercial uses of the shares; other commercial uses continue to be exercised by Venezuela. Section 1(a)(iv) of E.O. 13808 bars PDVH from paying dividends or other distribution of profits to the Government of Venezuela,[16] and section 1(b) prohibits the "purchase, directly

---

[16] The Executive Orders of our Government define "the Government of Venezuela" as specifically including PDVSA.

or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela." In addition, Section 1(a)(iii) of E.O. 13835 precludes United States persons or those within the United States from engaging in any transactions, provisions of financing, and other dealings related to "the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which [it] has a 50 percent or greater ownership interest."

However, the shares can still be used by PDVSA to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt. Venezuela illustrates its continued use of this power, noting that President Guaidó in February 2019 appointed an *ad hoc* administrative board to represent PDVSA in its capacity as sole shareholder of PDVH for appointing a new board of directors of that entity. These actions are available to the sole shareholder of a company, and so the shares continue to be used in commerce.

This is not to say that the sanctions of PDVSA assets play no role in whether Crystallex ultimately recovers. According to a Treasury Department Frequently Asked Question, any attachment and execution against PDVSA's shares of PDVH would likely need to be authorized by the Treasury Department. *See Del. Crystallex*, 333 F. Supp. 3d at 420–21. In a case like this, "[Treasury's Office of Foreign Asset Control, called by its acronym OFAC] would consider license applications seeking to attach and execute against such

E.O. 13808, 82 Fed. Reg. 41156 ("[T]he term . . . means the Government of Venezuela, any political subdivision, agency or instrumentality thereof, including . . . [PDVSA] . . ."); E.O. 13835, 83 Fed. Reg. 24001–02 (same).

equity interests on a case-by-case basis." *Id.* at 421. Whether that FAQ is legally binding, Crystallex has committed that it "will seek clarification of the current license . . . and/or the issuance of an additional license to cover the eventual execution sale of the shares of PDVH once the [attachment w]rit has issued." *Id.* at 421 n.40 (internal quotation marks omitted) (ellipsis in original).

Though the U.S. State Department has not sought to provide a statement of interest, it is nonetheless conceivable that short- or long-term U.S. foreign policy interests may be affected by attachment and execution of PDVSA's assets. The Treasury sanctions provide an explicit mechanism to account for these. Whether the Treasury Department permits execution in this case, it is clear that the sanctions do not make the PDVH shares immune from attachment under the Sovereign Immunities Act.

## IV. Conclusion

Under the Foreign Sovereign Immunities Act, there is a strong presumption that a foreign sovereign and its instrumentalities are separate legal entities. But the Supreme Court made clear in *Bancec* and *Rubin* that in extraordinary circumstances—including where a foreign sovereign exerts dominion over the instrumentality so extensive as to be beyond normal supervisory control—equity requires that we ignore the formal separateness of the two entities. This clears that bar easily. Indeed, if the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can.

The District Court acted within its jurisdiction when it issued a writ of attachment on PDVSA's shares of PDVH to satisfy Crystallex's judgment against Venezuela, and the

44

PDVH shares are not immune from attachment. Thus we affirm.