(Slip Opinion)          OCTOBER TERM, 2017          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RUBIN ET AL. *v.* ISLAMIC REPUBLIC OF IRAN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 16–534.   Argued December 4, 2017—Decided February 21, 2018

The Foreign Sovereign Immunities Act of 1976 (FSIA) grants foreign states and their agencies and instrumentalities immunity from suit in the United States and grants their property immunity from attachment and execution in satisfaction of judgments against them, see 28 U. S. C. §§1604, 1609, but with some exceptions.  Petitioners hold a judgment against respondent Islamic Republic of Iran pursuant to an exception that applies to foreign states designated as state sponsors of terrorism with respect to claims arising out of acts of terrorism.  See §1605A.  To enforce that judgment, petitioners filed an action in the District Court to attach and execute against certain Iranian assets—a collection of ancient clay tablets and fragments housed at respondent University of Chicago.  The District Court concluded that §1610(g)—which provides that certain property will be "subject to attachment in aid of execution, and execution, upon [a §1605A] judgment as provided in this section"—does not deprive the collection of the immunity typically afforded the property of a foreign sovereign.  The Seventh Circuit affirmed.

*Held*: Section 1610(g) does not provide a freestanding basis for parties holding a judgment under §1605A to attach and execute against the property of a foreign state; rather, for §1610(g) to apply, the immunity of the property at issue must be rescinded under a separate provision within §1610. Pp. 4–15.

  (a) Congress enacted the FSIA in an effort to codify the careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions.  As a default, foreign states have immunity "from the jurisdiction of the courts of the United States and of the States," §1604, but there are express exceptions, including the one at issue

here, for state sponsors of terrorism, see §1605A(a). The FSIA similarly provides as a default that "the property in the United States of a foreign state shall be immune from attachment arrest and execution." §1609. But §1610 outlines certain exceptions to this immunity. For example, §1610(a)(7) provides that property in the United States of a foreign state that is used for a commercial activity in the United States shall not be immune from attachment and execution where the plaintiff holds a §1605A judgment against the foreign state. Before 2008, the FSIA did not expressly address under which circumstances a foreign state's agencies or instrumentalities could be held liable for judgments against the state. The Court had addressed that question in *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 628 (*Bancec*), and held that, as a default, agencies and instrumentalities of a foreign state are separate legal entities that cannot be held liable. It recognized the availability of exceptions, however, and left the lower courts to determine whether an exception applied on a case-by-case basis. The lower courts coalesced around five relevant factors (the *Bancec* factors) to assist in those determinations. In 2008, Congress amended the FSIA, adding §1610(g). Subparagraphs (A) through (E) incorporate almost verbatim the *Bancec* factors, leaving no dispute that, at a minimum, §1610(g) serves to abrogate *Bancec* where a §1605A judgment holder seeks to satisfy a judgment held against the foreign state. The question here is whether, in addition to abrogating *Bancec*, it provides a freestanding exception to property immunity in the context of a §1605A judgment. Pp. 4–8.

(b) The most natural reading of §1610(g)(1)'s phrase "as provided in this section" is that it refers to §1610 as a whole, so that §1610(g)(1) will apply to property that is exempted from the grant of immunity as provided elsewhere in §1610. Those §1610 provisions that do unambiguously revoke the immunity of a foreign state's property employ phrases such as "shall not be immune," see §1610(a)(7), and "[n]otwithstanding any other provision of law," see §1610(f)(1)(A). Such textual markers are conspicuously absent from §1610(g). Thus, its phrase "as provided in this section" is best read to signal only that a judgment holder seeking to take advantage of §1610(g)(1) must identify a basis under one of §1610's express immunity-abrogating provisions to attach and execute against a relevant property. This reading provides relief to judgment holders who previously would not have been able to attach and execute against property of an agency or instrumentality of a foreign state in light of *Bancec*. It is also consistent with the basic interpretive canon to construe a statute so as to give effect to all of its provisions, see *Corley* v. *United States*, 556 U. S. 303, 314, and with the historical practice of rescinding attach-

ment and execution immunity primarily in the context of a foreign state's commercial acts, see *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 487–488. Pp. 8–11.

   (c) Petitioners' counterarguments are unpersuasive. They assert that the phrase "as provided in this section" might refer to the procedures in §1610(f)(1), which permits §1605A judgment holders to attach and execute against property associated with certain prohibited financial transactions, but which was waived by the President before it could take effect. However, it is not logical to read the phrase as indicating a congressional intent to create §1610(g) as an alternative to §1610(f)(1), particularly since Congress knows how to make clear when it is rescinding immunity. Nor could Congress have intended "as provided in this section" to refer only to §1610(f)(2)'s instruction that the Federal Government assist in identifying assets, since that provision does not provide for attachment or execution at all. Finally, there is no basis to conclude that "this section" in §1610(g) reflects a mere drafting error.

   The words "property of a foreign state," which appear in the first substantive clause of §1610(g), are not rendered superfluous under the Court's reading. Section 1610(g) serves to identify in one place all the categories of property that will be available to §1605A judgment holders for attachment and execution, and commands that the availability of such property will not be limited by the *Bancec* factors. Also, without the opening clause, §1610(g) would abrogate the *Bancec* presumption of separateness in all cases, not just those involving terrorism judgments under §1605A. Although petitioners contend that any uncertainty in §1610(g) should be resolved by giving full effect to the legislative purpose behind its enactment—removing obstacles to enforcing terrorism judgments—they offer no real support for their position that §1610(g) was intended to divest all property of a foreign state or its agencies or instrumentalities of immunity. *Bank Markazi* v. *Peterson*, 578 U. S. \_\_\_, \_\_\_, n. 2, distinguished. Pp. 12–15.

830 F. 3d 470, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which all other Members joined, except KAGAN, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 16–534

### JENNY RUBIN, ET AL., PETITIONERS *v.* ISLAMIC REPUBLIC OF IRAN, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

### [February 21, 2018]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Foreign Sovereign Immunities Act of 1976 (FSIA) grants foreign states and their agencies and instrumentalities immunity from suit in the United States (called jurisdictional immunity) and grants their property immunity from attachment and execution in satisfaction of judgments against them.  See 28 U. S. C. §§1604, 1609.  But those grants of immunity are subject to exception.

Petitioners hold a judgment against respondent Islamic Republic of Iran pursuant to one such exception to jurisdictional immunity, which applies where the foreign state is designated as a state sponsor of terrorism and the claims arise out of acts of terrorism.  See §1605A.  The issue presented in this case is whether certain property of Iran, specifically, a collection of antiquities owned by Iran but in the possession of respondent University of Chicago, is subject to attachment and execution by petitioners in satisfaction of that judgment.  Petitioners contend that the property is stripped of its immunity by another provision of the FSIA, §1610(g), which they maintain provides a blanket exception to the immunity typically afforded to

the property of a foreign state where the party seeking to attach and execute holds a §1605A judgment.

We disagree. Section 1610(g) serves to identify property that will be available for attachment and execution in satisfaction of a §1605A judgment, but it does not in itself divest property of immunity. Rather, the provision's language "as provided in this section" shows that §1610(g) operates only when the property at issue is exempt from immunity as provided elsewhere in §1610. Petitioners cannot invoke §1610(g) to attach and execute against the antiquities at issue here, which petitioners have not established are exempt from immunity under any other provision in §1610.

## I
### A

On September 4, 1997, Hamas carried out three suicide bombings on a crowded pedestrian mall in Jerusalem, resulting in the deaths of 5 people and injuring nearly 200 others. Petitioners are United States citizens who were either wounded in the attack or are the close relatives of those who were injured. In an attempt to recover for their harm, petitioners sued Iran in the District Court for the District of Columbia, alleging that Iran was responsible for the bombing because it provided material support and training to Hamas. At the time of that action, Iran was subject to the jurisdiction of the federal courts pursuant to 28 U. S. C. §1605(a)(7) (1994 ed., Supp. II), which rescinded the immunity of foreign states designated as state sponsors of terrorism with respect to claims arising out of acts of terrorism. Iran did not appear in the action, and the District Court entered a default judgment in favor of petitioners in the amount of $71.5 million.[1]

---

[1] Congress amended the FSIA in 2008 and replaced 28 U. S. C. §1605(a)(7) with a separate, more expansive provision addressing the foreign sovereign immunity of foreign states that are designated as

When Iran did not pay the judgment, petitioners brought this action in the District Court for the Northern District of Illinois to attach and execute against certain Iranian assets located in the United States in satisfaction of their judgment. Those assets—a collection of approximately 30,000 clay tablets and fragments containing ancient writings, known as the Persepolis Collection—are in the possession of the University of Chicago, housed at its Oriental Institute. University archeologists recovered the artifacts during an excavation of the old city of Persepolis in the 1930's. In 1937, Iran loaned the collection to the Oriental Institute for research, translation, and cataloging.[2]

Petitioners maintained in the District Court, *inter alia*, that §1610(g) of the FSIA renders the Persepolis Collection subject to attachment and execution. The District Court concluded otherwise and held that §1610(g) does not deprive the Persepolis Collection of the immunity typically afforded the property of a foreign sovereign. The Court of Appeals for the Seventh Circuit affirmed. 830 F. 3d 470 (2016). As relevant, the Seventh Circuit held that the text of §1610(g) demonstrates that the provision serves to identify the property of a foreign state or its agencies or

—————

state sponsors of terrorism, §1605A. See National Defense Authorization Act for Fiscal Year 2008 (NDAA), §1083(a), 122 Stat. 338–341. Shortly thereafter, petitioners moved in the District Court for an order converting their judgment under §1605(a)(7) to one under the new provision, §1605A, which the District Court granted. See *Rubin* v. *Islamic Republic of Iran*, 563 F. Supp. 2d 38, 39, n. 3 (DC 2008).

[2] Petitioners also sought to execute the judgment against three other collections that are no longer at issue in this case: the Chogha Mish Collection, the Oriental Institute Collection, and the Herzfeld Collection. The Chogha Mish Collection has been removed from the territorial jurisdiction of the federal courts, and the Court of Appeals for the Seventh Circuit determined that the Oriental Institute Collection and Herzfeld Collection are not property of Iran. See 830 F. 3d 470, 475–476 (2016). Petitioners do not challenge that decision here.

instrumentalities that are subject to attachment and execution, but it does not in itself divest that property of immunity. The Court granted certiorari to resolve a split among the Courts of Appeals regarding the effect of §1610(g).[3]  582 U. S. ___ (2017). We agree with the conclusion of the Seventh Circuit, and therefore affirm.

B

We start with a brief review of the historical development of foreign sovereign immunity law and the statutory framework at issue here, as it provides a helpful guide to our decision. This Court consistently has recognized that foreign sovereign immunity "is a matter of grace and comity on the part of the United States." *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983); *Schooner Exchange* v. *McFaddon,* 7 Cranch 116, 136 (1812). In determining whether to exercise jurisdiction over suits against foreign sovereigns, courts traditionally "deferred to the decisions of the political branches . . . on whether to take jurisdiction over actions against foreign sovereigns." *Verlinden*, 461 U. S., at 486.

Prior to 1952, the State Department generally held the position that foreign states enjoyed absolute immunity from all actions in the United States. See *ibid.* But, as foreign states became more involved in commercial activity in the United States, the State Department recognized that such participation "makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts." J. Tate, Changed Policy

---

[3] Compare *Bennett* v. *Islamic Republic of Iran*, 825 F. 3d 949, 959 (CA9 2016) (holding that §1610(g) provides a freestanding exception to attachment and execution immunity); *Weinstein* v. *Islamic Republic of Iran*, 831 F. 3d 470, 483 (CADC 2016) (same); *Kirschenbaum* v. *650 Fifth Avenue and Related Properties*, 830 F. 3d 107, 123 (CA2 2016) (same), with 830 F. 3d, at 481 (concluding that §1610(g) does not create a freestanding exception to immunity).

Concerning the Granting of Sovereign Immunity to Foreign Governments, 26 Dept. State Bull. 984, 985 (1952). The Department began to follow the "restrictive" theory of foreign sovereign immunity in advising courts whether they should take jurisdiction in any given case. Immunity typically was afforded in cases involving a foreign sovereign's public acts, but not in "cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U. S., at 487.

In 1976, Congress enacted the FSIA in an effort to codify this careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions. 90 Stat. 2891, as amended, 28 U. S. C. §1602 *et seq.* "For the most part, the Act" tracks "the restrictive theory of sovereign immunity." *Verlinden*, 461 U. S., at 488. As a default, foreign states enjoy immunity "from the jurisdiction of the courts of the United States and of the States." §1604. But this immunity is subject to certain express exceptions. For example, in line with the restrictive theory, a foreign sovereign will be stripped of jurisdictional immunity when a claim is based upon commercial activity it carried out in the United States. See, *e.g.,* §1605(a)(2). The FSIA also provides that a foreign state will be subject to suit when it is designated as a state sponsor of terrorism and damages are sought as a result of acts of terrorism. See §1605A(a).

With respect to the immunity of property, the FSIA similarly provides as a default that "the property in the United States of a foreign state shall be immune from attachment arrest and execution." §1609. But, again, there are exceptions, and §1610 outlines the circumstances under which property will not be immune. See §1610. For example, subsection (a) expressly provides that property "shall not be immune" from attachment and execution where, *inter alia,* it is "used for a commercial activity in the

United States" and the "judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based." §1610(a)(7).

Prior to 2008, the FSIA did not address expressly under what circumstances, if any, the agencies or instrumentalities of a foreign state could be held liable for judgments against the state. Faced with that question in *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611 (1983) (*Bancec*), this Court held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.,* at 626–627. Thus, as a default, those agencies and instrumentalities of a foreign state were to be considered separate legal entities that cannot be held liable for acts of the foreign state. See *id.,* at 628.

Nevertheless, the Court recognized that such a stringent rule should not be without exceptions. The Court suggested that liability would be warranted, for example, "where a corporate entity is so extensively controlled by [the state] that a relationship of principal and agent is created," *id.,* at 629, or where recognizing the state and its agency or instrumentality as distinct entities "would work fraud or injustice," *ibid.* (internal quotation marks omitted). See *id.,* at 630. But the Court declined to develop a "mechanical formula for determining" when these exceptions should apply, *id.,* at 633, leaving lower courts with the task of assessing the availability of exceptions on a case-by-case basis. Over time, the Courts of Appeals coalesced around the following five factors (referred to as the *Bancec* factors) to aid in this analysis:

"(1) the level of economic control by the government;

"(2) whether the entity's profits go to the government;

"(3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;

"(4) whether the government is the real beneficiary of the entity's conduct; and

"(5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Walter Fuller Aircraft Sales, Inc.* v. *Republic of Philippines*, 965 F. 2d 1375, 1380, n. 7 (CA5 1992); see also *Flatow* v. *Islamic Republic of Iran*, 308 F. 3d 1065, 1071, n. 9 (CA9 2002).

In 2008, Congress amended the FSIA and added §1610(g). See NDAA §1083(b)(3)(D), 122 Stat. 341–342. Section 1610(g)(1) provides:

"(g) Property in Certain Actions.—

"(1) In general. [T]he property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

"(A) the level of economic control over the property by the government of the foreign state;

"(B) whether the profits of the property go to that government;

"(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

"(D) whether that government is the sole beneficiary in interest of the property; or

"(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations."

Subparagraphs (A) through (E) incorporate almost verbatim the five *Bancec* factors, leaving no dispute that, at a minimum, §1610(g) serves to abrogate *Bancec* with respect to the liability of agencies and instrumentalities of a foreign state where a §1605A judgment holder seeks to satisfy a judgment held against the foreign state. The issue at hand is whether §1610(g) does something more; whether, like the commercial activity exception in §1610(a)(7), it provides an independent exception to immunity so that it allows a §1605A judgment holder to attach and execute against *any* property of the foreign state, regardless of whether the property is deprived of immunity elsewhere in §1610.

## II

We turn first to the text of the statute. Section 1610(g)(1) provides that certain property will be "subject to attachment in aid of execution, and execution, upon [a §1605A] judgment *as provided in this section.*" (Emphasis added.) The most natural reading is that "this section" refers to §1610 as a whole, so that §1610(g)(1) will govern the attachment and execution of property that is exempted from the grant of immunity as provided elsewhere in §1610. Cf. *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 487 (1999) (noting that the phrase "[e]xcept as provided in this section" in one subsection serves to incorporate "the rest of" the section in which the subsection appears).

Other provisions of §1610 unambiguously revoke the immunity of property of a foreign state, including specifically where a plaintiff holds a judgment under §1605A, provided certain express conditions are satisfied. For example, subsection (a) provides that "property in the

United States . . . used for a commercial activity in the
United States . . . shall not be immune" from attachment
and execution in seven enumerated circumstances, includ-
ing when "the judgment relates to a claim for which the
foreign state is not immune under section 1605A . . . ."
§1610(a)(7). Subsections (b), (d), and (e) similarly set out
circumstances in which certain property of a foreign state
"shall not be immune."[4] And two other provisions within
§1610 specifically allow §1605A judgment holders to at-
tach and execute against property of a foreign state,
"[n]otwithstanding any other provision of law," including
those provisions otherwise granting immunity, but only
with respect to assets associated with certain regulated
and prohibited financial transactions. See §1610(f)(1)(A);
Terrorism Risk Insurance Act of 2002 (TRIA), §201(a), 116
Stat. 2337, note following 28 U. S. C. §1610.

Section 1610(g) conspicuously lacks the textual markers,
"shall not be immune" or "notwithstanding any other
provision of law," that would have shown that it serves as
an independent avenue for abrogation of immunity. In
fact, its use of the phrase "as provided in this section"
signals the opposite: A judgment holder seeking to take
advantage of §1610(g)(1) must identify a basis under one
of §1610's express immunity-abrogating provisions to
attach and execute against a relevant property.

Reading §1610(g) in this way still provides relief to
judgment holders who previously would not have been
able to attach and execute against property of an agency
or instrumentality of a foreign state in light of this Court's
decision in *Bancec.* Suppose, for instance, that plaintiffs
obtain a §1605A judgment against a foreign state and seek

——————

[4] Section 1610(b), for example, provides that "any property . . . of [the]
agency or instrumentality of a foreign state engaged in commercial
activity in the United States shall not be immune" from attachment
and execution in satisfaction of a judgment on a claim for which the
agency or instrumentality is not immune under §1605A. §1610(b)(3).

to collect against the assets located in the United States of a state-owned telecommunications company. Cf. *Alejandre* v. *Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F. 3d 1277 (CA11 1999). Prior to the enactment of §1610(g), the plaintiffs would have had to establish that the *Bancec* factors favor holding the agency or instrumentality liable for the foreign state's misconduct. With §1610(g), however, the plaintiffs could attach and execute against the property of the state-owned entity regardless of the *Bancec* factors, so long as the plaintiffs can establish that the property is otherwise not immune (*e.g.,* pursuant to §1610(a)(7) because it is used in commercial activity in the United States).

Moreover, our reading of §1610(g)(1) is consistent "with one of the most basic interpretive canons, that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley* v. *United States*, 556 U. S. 303, 314 (2009) (internal quotation marks omitted). Section 1610 expressly references §1605A judgments in its immunity-abrogating provisions, such as 28 U. S. C. §§1610(a)(7), (b)(3), (f)(1), and §201 of the TRIA, showing that those provisions extend to §1605A judgment holders' ability to attach and execute against property. If the Court were to conclude that §1610(g) establishes a basis for the withdrawal of property immunity any time a plaintiff holds a judgment under §1605A, each of those provisions would be rendered superfluous because a judgment holder could always turn to §1610(g), regardless of whether the conditions of any other provision were met.[5]

--------

[5] To the extent petitioners suggest that those references to §1605A were inadvertent, see Brief for Petitioners 41–44, the statutory history further supports the conclusion that §1610(a)(7) applies to §1605A judgment holders, as the reference to §1605A was added to §1610(a)(7) in the same Act that created §§1605A and 1610(g). See NDAA §§1083(a), (b)(3), 122 Stat. 338–342.

The Court's interpretation of §1610(g) is also consistent with the historical practice of rescinding attachment and execution immunity primarily in the context of a foreign state's commercial acts. See *Verlinden*, 461 U. S., at 487–488. Indeed, the FSIA expressly provides in its findings and declaration of purpose that

> "[u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." §1602.

This focus of the FSIA is reflected within §1610, as subsections (a), (b), and (d) all outline exceptions to immunity of property when that property is used for commercial activity. The Court's reading of §1610(g) means that individuals with §1605A judgments against a foreign state must primarily invoke other provisions revoking the grant of immunity for property related to commercial activity, including §1610(a)(7), unless the property is expressly carved out in an exception that applies "[n]otwithstanding any other provision of law," §1610(f)(1)(A); §201(a) of the TRIA. That result is consistent with the history and structure of the FSIA.

Throughout the FSIA, special avenues of relief to victims of terrorism exist, even absent a nexus to commercial activity. Where the FSIA goes so far as to divest a foreign state or property of immunity in relation to terrorism-related judgments, however, it does so expressly. See §§1605A, 1610(a)(7), (b)(3), (f)(1)(A); §201(a) of the TRIA. Out of respect for the delicate balance that Congress struck in enacting the FSIA, we decline to read into the statute a blanket abrogation of attachment and execution immunity for §1605A judgment holders absent a clearer indication of Congress' intent.

### III
### A

Petitioners resist that the phrase "as provided in this section" refers to §1610 as a whole and contend that Congress more likely was referencing a specific provision within §1610 or a section in the NDAA. That explanation is unpersuasive.

Petitioners first assert that "this section" might refer to procedures contained in §1610(f). Section 1610(f) permits §1605A judgment holders to attach and execute against property associated with certain regulated and prohibited financial transactions, §1610(f)(1), and it provides that the United States Secretary of State and Secretary of the Treasury will make every effort to assist in "identifying, locating, and executing against the property of [a] foreign state or any agency or instrumentality of such state," §1610(f)(2). Petitioners point out that paragraph (1) of subsection (f) has never come into effect because it was immediately waived by the President after it was enacted, pursuant to §1610(f)(3).[6] So, the argument goes, it would make sense that Congress created §1610(g) as an alternative mechanism to achieve a similar result.[7]

This is a strained and unnatural reading of the phrase "as provided in this section." In enacting §201(a) of the TRIA, which, similar to 28 U. S. C. §1610(f), permits attachment and execution against blocked assets, Congress signaled that it was rescinding immunity by permitting attachment and execution "[n]otwithstanding any other provision of law." See §201(a) of the TRIA. Had

---

[6] Section 1610(f)(3) authorizes the President to waive paragraph (1) of subsection (f) "in the interest of national security." President Clinton immediately waived the provision, and the waiver has never been withdrawn. See Pres. Determ. No. 99–1, 63 Fed. Reg. 59201 (1998); Pres. Determ. No. 2001–03, 65 Fed. Reg. 66483 (2000).

[7] Petitioners reference the decision of the Court of Appeals for the Ninth Circuit in *Bennett*, 825 F. 3d 949, in support of this position.

Congress likewise intended §1610(g) to have such an effect, it knew how to say so. Cf. *Bank Markazi* v. *Peterson*, 578 U. S. \_\_\_, \_\_\_, n. 2 (2016) (slip op., at 4, n. 2) (noting that "[s]ection 1610(g) does not take precedence over 'any other provision of law,' as the TRIA does").

Petitioners fare no better in arguing that Congress may have intended "this section" to refer only to the instruction in §1610(f)(2) that the United States Government assist in identifying assets. Section 1610(f)(2) does not provide for attachment or execution at all, so petitioners' argument does not account for the lack of textual indicators that exist in provisions like §§1610(a)(7) and (f)(1) that unambiguously abrogate immunity and permit attachment and execution.

Finally, petitioners assert that "this section" could possibly reflect a drafting error that was intended to actually refer to §1083 of the NDAA, the Public Law in which §1610(g) was enacted. This interpretation would require not only a stark deviation from the plain text of §1610(g), but also a departure from the clear text of the NDAA. Section 1083(b)(3) of the NDAA provides that "Section 1610 of title 28, United States Code, is amended . . . by adding at the end" the new subsection "(g)." 122 Stat. 341. The language "this section" within (g), then, clearly and expressly incorporates the NDAA's reference to "Section 1610" as a whole. There is no basis to conclude that Congress' failure to change "this section" in §1610(g) was the result of a mere drafting error.

## B

In an effort to show that §1610(g) does much more than simply abrogate the *Bancec* factors, petitioners argue that the words "property of a foreign state," which appear in the first substantive clause of §1610(g), would otherwise be rendered superfluous because the property of a foreign state will never be subject to a *Bancec* inquiry. By its

plain text, §1610(g)(1) permits enforcement of a §1605A judgment against both the property of a foreign state and the property of the agencies or instrumentalities of that foreign state. Because the *Bancec* factors would never have applied to the property of a foreign state, petitioners contend, those words must signal something else: that §1610(g) provides an independent basis for the withdrawal of immunity.

The words "property of a foreign state" accomplish at least two things, however, that are consistent with the Court's understanding of the effect of §1610(g). First, §1610(g) serves to identify in one place all the categories of property that will be available to §1605A judgment holders for attachment and execution, whether it is "property of the foreign state" or property of its agencies or instrumentalities, and commands that the availability of such property will not be limited by the *Bancec* factors. So long as the property is deprived of its immunity "as provided in [§1610]," all of the types of property identified in §1610(g) will be available to §1605A judgment holders.

Second, in the context of the entire phrase, "the property of a foreign state against which a judgment is entered under section 1605A," the words "foreign state" identify the type of judgment that will invoke application of §1610(g); specifically, a judgment held against a foreign state and entered under §1605A. Without this opening phrase, §1610(g) would abrogate the *Bancec* presumption of separateness in all cases, not just those involving terrorism judgments under §1605A. The words, "property of a foreign state," thus, are not rendered superfluous under the Court's reading because they do not merely identify a category of property that is subject to §1610(g) but also help inform when §1610(g) will apply in the first place. Indeed, §1610(g) would make no sense if those words were removed.

C

All else aside, petitioners contend that any uncertainty in §1610(g) should be resolved by giving full effect to the legislative purpose behind its enactment. Petitioners posit that Congress enacted §1610(g) "with the specific purpose of removing the remaining obstacles to terrorism judgment enforcement." Brief for Petitioners 26. In support of that position, they reference a brief discussion of §1610(g) in a footnote to the Court's decision in *Bank Markazi*, 578 U. S. \_\_\_, that notes that Congress "expand[ed] the availability of assets for postjudgment execution" when it added §1610(g) by making "available for execution the property (whether or not blocked) of a foreign state sponsor of terrorism, or its agency or instrumentality, to satisfy a judgment against that state." *Id.,* at \_\_\_, n. 2 (slip op., at 4, n. 2). But *Bank Markazi*'s characterization of §1610(g) simply mirrors the text of §1610(g) and is entirely consistent with the Court's holding today that §1610(g) expands the assets available for attachment and execution by abrogating this Court's decision in *Bancec* with respect to judgments held under §1605A. Beyond their citation to *Bank Markazi*, petitioners have not directed us to any evidence that supports their position that §1610(g) was intended to divest all property of a foreign state or its agencies or instrumentalities of immunity.

IV

For the foregoing reasons, we conclude that 28 U. S. C. §1610(g) does not provide a freestanding basis for parties holding a judgment under §1605A to attach and execute against the property of a foreign state, where the immunity of the property is not otherwise rescinded under a separate provision within §1610. The judgment of the Seventh Circuit is affirmed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.