# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 21, 2019      Decided December 20, 2019

No. 18-5319

CARES COMMUNITY HEALTH,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02774)

———

*James L. Feldesman* argued the cause for appellant. With him on the briefs were *Matthew S. Freedus* and *David A. Bender*.

*Karen Schoen*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, and *Alisa B. Klein*, Attorney.

Before: TATEL, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: A provision of the Medicare statute we call the Not Less Than Provision, 42 U.S.C. § 1395w-27(e)(3)(A), requires that private Medicare insurance plans' reimbursements to a Federally Qualified Health Center (FQHC) for government-subsidized medical services be "not less than" what the insurers pay other healthcare providers not receiving such subsidies. Cares Community Health, an FQHC, claims that the Not Less Than Provision also prevents private Medicare prescription drug plans from reimbursing an FQHC less for dispensing pharmaceuticals than they would reimburse a non-FQHC for dispensing the same drugs. Cares sued the U.S. Department of Health and Human Services (HHS), the HHS Secretary, and the Administrator of the Centers for Medicare and Medicaid Services (CMS), claiming that they unlawfully allowed an insurer offering Medicare prescription drug coverage, Humana Health Plan, Inc., to pay Cares less for drugs that Cares obtains at a discount under a separate federal program known as Section 340B, *id*. § 256b, than Humana would reimburse a non-FQHC for the same drugs. The district court dismissed Cares' claim, holding that the Medicare statute does not mandate that HHS require Humana to reimburse FQHCs for discounted pharmaceuticals at a rate "not less than" Humana pays other providers for the same drugs. *Cares Cmty. Health v. HHS*, 346 F. Supp. 3d 121, 129 (D.D.C. 2018) (quoting 42 U.S.C. § 1395w-27(e)(3)(A)). We affirm.

## BACKGROUND

To become an FQHC like Cares under the Medicare program, 42 U.S.C. § 1395x(aa)(4), a health center must provide "primary health services" to "medically underserved" communities, *id*. § 254b(a), regardless of patients' ability to pay, *see id*. § 254b(k)(3)(G). FQHCs are a key part of the medical safety net for low-income individuals without health insurance. Recognizing that FQHCs' central role in treating

low-income, uninsured patients means that they provide lots of uncompensated care, Congress has provided FQHCs various forms of financial support. *See generally Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 136 (2d Cir. 2014).

The Medicare statute provides one such support through governmental "wraparound" payments. Those payments make up the difference between what private insurers reimburse FQHCs for providing non-pharmacy outpatient medical services to Medicare beneficiaries and what traditional Medicare would reimburse a provider for the same services, which might be higher. *See* 42 U.S.C. § 1395*l*(a)(3)(B). Because insurers might otherwise be tempted to save money at the government's expense by lowering their reimbursements to FQHCs receiving wraparound payments, Medicare's Not Less Than Provision prevents insurers from exploiting the wraparound support by selectively reducing reimbursement rates to FQHCs. *See id*. § 1395w-27(e)(3)(A).

The Public Health Service Act provides a second support through Section 340B, which requires drug manufacturers participating in Medicaid to offer pharmaceutical discounts to FQHCs and certain other safety-net healthcare providers. *See id*. § 256b. These drug discounts can produce income for eligible providers insofar as insurers reimburse them at market prices that exceed the 340B-discounted price. Notwithstanding some difference in how these two supports operate, Cares argues that the Medicare statute's protection against insurers' freeloading off the wraparound program also necessarily forbids insurers from lowering their reimbursements to capture for themselves the benefit of Section 340B discounts.

## A. The "Not Less Than" Payment Mandate

"The federal Medicare program reimburses medical providers" such as FQHCs "for services they supply to eligible

4

patients" age 65 and older or with disabilities. *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011). The Medicare statute is divided into five "Parts," lettered A through E, with Parts A through D each corresponding to a separate benefit category under Medicare. *Id*. Traditional Medicare comprises Part A, which "covers medical services furnished by hospitals and other institutional care providers," and Part B, which covers outpatient care like physician and laboratory services. *Id*. Congress authorized wraparound payments to FQHCs in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Medicare Modernization Act or MMA), Pub. L. No. 108-173, 117 Stat. 2066, which "established the Medicare Advantage program" in Part C, *id*. § 201(a), 117 Stat. at 2176 (codified as amended at 42 U.S.C. § 1395w-21 *et seq*.), and added prescription drug coverage to Medicare in Part D, *id*. § 101, 117 Stat. at 2071 (codified as amended at 42 U.S.C. § 1395w-101 *et seq*.).

**1. Medicare Part C Services and Wraparound Payments**

Under Medicare Advantage (Part C), private insurance companies—known as Medicare Advantage organizations—contract with CMS to offer Medicare beneficiaries a similar range of medical coverage to what traditional Medicare funds directly under Parts A and B. *See Ne. Hosp. Corp.*, 657 F.3d at 2; *see also MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1316 (11th Cir. 2019). CMS pays those insurers (the Medicare Advantage organizations) a fixed amount for each eligible Medicare beneficiary they enroll, and the insurers in turn negotiate agreements with healthcare providers to reimburse them for services they provide to the insurers' enrolled beneficiaries. *See Ne. Hosp. Corp.*, 657 F.3d at 3. Part C imposes certain requirements on CMS' contracts with insurers, *e.g.*, 42 U.S.C. § 1395w-27, some of which CMS

must require insurers to implement in their agreements with providers, *e.g.*, *id*. § 1395w-27(e)(3)(A).

Relevant here, the Medicare Modernization Act includes three interlocking requirements regarding Medicare Advantage organizations' relationship with FQHCs, each of which we give a shorthand name for ease of reference. *See* MMA § 237(a)-(c), 117 Stat. at 2212-13.

*First*, the Wraparound Payment Provision, codified in Medicare Part B, authorizes wraparound payments from the Federal Supplementary Medical Insurance Trust Fund, a funder of outpatient services that beneficiaries receive under Part B. 42 U.S.C. § 1395*l*(a)(3)(B); *see also Schweiker v. McClure*, 456 U.S. 188, 190 (1982). Wraparound payments make up the difference between the reimbursement amount Medicare Part B sets for "[FQHC] services," 42 U.S.C. § 1395k(a)(2)(D)(ii), and what insurers and beneficiaries actually pay FQHCs for those services under Part C. *See id*. § 1395*l*(a)(3)(B). That shortfall occurs because insurer and patient payment methodologies under Part C yield payment amounts that do not always match what FQHCs are due under Part B. *Id*. Wraparound payments thus help to meet FQHCs' costs of providing outpatient medical services. The parties agree that the Wraparound Payment Provision's reference to "[FQHC] services"—a term that Medicare defines as outpatient services provided under Medicare Part B, *id*. § 1395x(aa)(3)—does not encompass prescription drugs, so wraparound payments top up payments for outpatient services provided by FQHCs, but not their pharmacy services.

*Second*, the Written Agreement Provision, codified in Part C under the heading "Payment rule for [FQHC] services," helps to implement the Wraparound Payment Provision by specifying which transactions count for wraparound payments

as well as when and where the Trust Fund must make such payments. *Id*. § 1395w-23(a)(4). The Written Agreement Provision requires a wraparound payment "directly" to an FQHC whenever a Medicare beneficiary "who is enrolled with [a Medicare Advantage] plan under [Part C] receives a service from a[n FQHC] that has a written agreement with the [Medicare Advantage] organization that offers such plan for providing such a service." *Id*.

*Third*, recognizing that wraparound payments could encourage insurers to reduce their reimbursements to FQHCs because they know the Trust Fund is on the hook for any shortfall, Part C's Not Less Than Provision compels CMS to police insurers' reimbursements to FQHCs. Specifically, it mandates that CMS' contracts with Medicare Advantage organizations require the agreements identified in the Written Agreement Provision to stipulate that payments "to the [FQHC] for services provided by such" FQHC are "not less than the level and amount of payment that the [Medicare Advantage] plan would make for such services if the services had been furnished by" a non-FQHC. *Id*. § 1395w-27(e)(3)(A). The Not Less Than Provision thereby prevents private insurers participating in Medicare Advantage from reducing their reimbursements in order to save money at the Trust Fund's expense.

Together, the Wraparound Payment and Written Agreement Provisions mandate and spell out implementation of subsidies for FQHCs providing "[FQHC] services" to Medicare Advantage beneficiaries. The Not Less Than Provision is applied through the Written Agreement Provision's "written agreement" to protect the wraparound payment regime's fiscal sustainability. The Written Agreement Provision identifies which transactions are subject to the Not Less Than Provision; if the benefit in question is not

covered by the "written agreement described in" the Written Agreement Provision, there is nothing through which the "not less than" mandate can apply.

## 2. Medicare Part D Prescription Drug Coverage

Like Medicare Advantage, Medicare Part D's prescription drug benefit program "operates as a public-private partnership between [CMS] and . . . private insurance companies called 'Sponsors' that administer prescription drug plans." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 749 (3d Cir. 2017). The Part C and D public-private insurance programs are in many ways parallel. Prescription drug coverage need not be provided in combination with coverage of non-pharmacy outpatient services, but it may be. When Medicare Advantage plans also offer prescription drug coverage under Medicare Part D, those dual-purpose plans are known as MA-PD plans. *See* 42 U.S.C. § 1395w-101(a)(3).

Reflecting their parallelism, the Part D statute imports various Part C provisions. As relevant here, it does so through two additional provisions we dub the Part D Contract Provision and the Part D Rewording Provision. First, the Part D Contract Provision applies "section 1395w-27(e)"—which includes the Not Less Than Provision, *id*. § 1395w-27(e)(3)(A)—to CMS' Medicare contracts with insurers sponsoring prescription drug coverage. *Id*. § 1395w-112(b)(3)(D). Second, the Part D Rewording Provision requires that wherever Part C provisions like the Not Less Than Provision apply in Part D, those "provisions shall be applied as if" any reference to a Medicare Advantage plan "included a reference to a prescription drug plan;" any reference to a Medicare Advantage organization "included a reference to a" prescription drug plan sponsor; and "any reference to a contract under section 1395w-27" in Part C "included a reference to a contract under

section 1395w-112(b)" in Part D. *Id*. § 1395w-151(b)(1)-(3). Notably, the parties identify nothing in the Medicare statute that applies the Wraparound Payment Provision or the Written Agreement Provision to Part D or revises for purposes of Part D the Not Less Than Provision's reference to a "written agreement described in" the Written Agreement Provision. *Id*. § 1395w-27(e)(3)(A).

The Part D Contract Provision thus would appear to apply the Not Less Than Provision to CMS' contracts with insurers offering prescription drug coverage, while the Part D Rewording Provision dictates how to read the Not Less Than Provision in the Part D context.

### B. Section 340B Drug Discounts

Section 340B's drug discount program, enacted in 1992 within the Public Health Service Act, *see* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967-71 (codified as amended at 42 U.S.C. § 256b), and administered by the Health Resources and Services Administration, is statutorily and administratively separate from Medicare. *See Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 113 (2011). "Section 340B requires a manufacturer of 'covered outpatient drugs' to enter into a contract with the Secretary of HHS—a condition for eligibility for Medicaid matching funds—under which the manufacturer agrees to provide these drugs to certain 'covered entities' at discounted prices." *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 439 (D.C. Cir. 1999) (quoting 42 U.S.C. § 256b(a)(1)). The "covered entities" entitled to pharmaceutical discounts from drug manufacturers comprise some sixteen types of healthcare providers, including FQHCs and various other types of clinics and hospitals, many of which supply "safety-net services to the poor." *Astra USA*, 563 U.S. at 113; *see* 42 U.S.C. § 256b(a)(4).

For the quarter century it has been in place, Section 340B has aided eligible hospitals and clinics in two ways: It has directly afforded FQHCs and other healthcare safety-net providers savings on drugs, and it has indirectly benefitted those providers when insurance reimbursements exceed discounted pharmaceutical prices. The class of eligible hospitals and clinics that provides drugs for free or at reduced cost to qualifying patients saves billions of dollars per year by obtaining those drugs at discount under Section 340B. *See* Medicare Payment Advisory Comm'n, *Report to the Congress: Overview of the 340B Drug Pricing Program* 6 (May 2015) (MedPAC Report); *see also* 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation: Final Rule, 82 Fed. Reg. 1,210, 1,227 n.1 (Jan. 5, 2017). In addition to those savings, eligible providers garner income as a result of the 340B discounts when they furnish 340B drugs to insured patients, because the insurers' standard-rate "reimbursements for the [discounted] drugs exceed the 340B prices [providers] pay for the drugs." MedPAC Report at 8. A congressionally mandated study of how eligible providers use this "income from the 340B program," Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7103(b)(3), 124 Stat. 119, 828 (2010), found that the above-cost insurance reimbursements help safety-net providers fund the uncompensated care they supply and expand the services they offer. *See* U.S. Gov't Accountability Office, GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement* 17 (Sept. 2011) (GAO Report).

### C. Factual & Procedural History

The issue on appeal arises at the intersection of Medicare and Section 340B. Cares contends that the Not Less Than Provision, 42 U.S.C. § 1395w-27(e)(3)(A), precludes

prescription drug plans from paying less for pharmaceuticals dispensed by FQHCs—including 340B-discounted drugs—in the same way it precludes insurers from paying less for "[FQHC] services" to prevent exploitation of governmental subsidies paid under the Wraparound Payment Provision, *id*. § 1395*l*(a)(3)(B).

In September 2009, Cares executed a Pharmacy Provider Agreement with Humana to provide prescription drug services under Humana's MA-PD plan. Five years later, shortly after Cares became an FQHC, Humana sent Cares an amendment to the Agreement that set reimbursement rates for what Humana refers to as "340B pharmacy services" at about two-thirds the rate Humana pays other types of providers for "Retail Pharmacy Services." Am. Compl. ¶ 37 (A. 23). "340B pharmacy services" are the same as "Retail Pharmacy Services" except that "340B pharmacy services" cover drugs discounted under Section 340B, while "Retail Pharmacy Services" do not.

Apparently, Cares' experience with Humana is not unique; other 340B-eligible providers report that insurers sponsoring Medicare Part D coverage recently have "reduc[ed] contracted reimbursement rates for drugs based on the [provider's] status as a 340B provider" entitled to the 340B discount. GAO Report at 14. Essentially, Humana's Pharmacy Provider Agreement amendment lowered the reimbursement it paid Cares to account for the discount Cares receives under Section 340B, which resulted in Cares receiving less reimbursement than non-FQHCs for the same medications. As of May 2018, Cares had recovered some $3 million less—nearly $5,000 per working day—than it would have recovered absent the amendment lowering Humana's reimbursements for "340B pharmacy services." Am. Compl. ¶ 41 (A. 24). (HHS itself decided in November 2017 to reduce Medicare

reimbursements for 340B pharmacy services to some eligible hospitals on the ground that 340B-eligible hospitals "are able to buy covered drugs at amounts significantly below the average sales price." *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 824 (D.C. Cir. 2018).)

After disputing the amended reimbursement rates before an arbitrator who refused to decide the rates' lawfulness, Cares filed this lawsuit claiming that Humana's differential reimbursement rates resulted from HHS' unlawful failure to enforce the Not Less Than Provision against Humana, in violation of the Medicare statute and the Administrative Procedure Act (APA), 5 U.S.C. § 706. Cares asserts two alternative APA theories: First, HHS unlawfully withheld required agency action by failing to apply the Not Less Than Provision's FQHC payment requirement to Humana's Pharmacy Provider Agreement with Cares, *see id*. § 706(1); and, second, HHS' inaction is arbitrary and capricious, *see id*. § 706(2)(A). The HHS defendants moved to dismiss, arguing that the Not Less Than Provision does not apply to prescription drug plans' reimbursement of pharmacy services, so there is no unlawfully withheld action or arbitrary and capricious inaction. In response, Cares argued that the Not Less Than Provision covers pharmacy services because it applies to all "services provided by [an FQHC]," 42 U.S.C. § 1395w-27(e)(3)(A), not the narrower, Medicare-defined category of "[FQHC] services," *id*. § 1395x(aa)(3), which excludes prescription drugs; that Part D applies the Not Less Than Provision to Medicare prescription drug plans' agreements with FQHCs; and that Congress intended savings from the Section 340B program to remain with FQHCs.

The district court held that Cares failed to state a claim "because the proposition that the [Not Less Than Provision's] payment requirement must be included in Part D contracts or

that the payment requirement applies to Part D drugs is wrong as a matter of law." *Cares Cmty. Health*, 346 F. Supp. 3d at 129. First, acknowledging that the Not Less Than Provision uses the phrase "services provided by such [FQHC]," not the defined term, "[FQHC] services," the court nonetheless "conclude[d] that the slight variation in phrasing cannot" justify reading "services provided by such [FQHC]" to include pharmacy services not counted as "[FQHC] services." *Id*. Next, the court declined to read Part D to apply the Not Less Than Provision to prescription drug plans' reimbursement of pharmaceuticals, reasoning that no Part D provision "alter[ed] the statutory definition of [FQHC] services, which excludes Part D drugs." *Id*. at 130 (emphasis omitted). Recognizing that reading the Part D Contract Provision to have no practical effect on the Not Less Than Provision presents "the possibility of some amount of surplusage," the district court nevertheless concluded that possible surplusage "is not enough to defeat the plain text of the" statute. *Id*. Finally, the court rejected Cares' "statutory purpose argument," finding no unambiguous textual "hook" for the contention that "Congress intended FQHCs, not [insurers], to internalize the benefit of discounted prescription drugs." *Id*.

Cares timely appealed the dismissal under 28 U.S.C. § 1291. On *de novo* review of the district court's order granting the motion to dismiss, we assume the truth of all plausibly pleaded allegations and draw all reasonable inferences in Cares' favor. *Agnew v. District of Columbia*, 920 F.3d 49, 53 (D.C. Cir. 2019).

## ANALYSIS

To review Cares' claim that the Medicare statute precludes HHS from approving prescription drug plans that reimburse FQHCs less than they reimburse other healthcare providers, we

first "look to the 'traditional tools of statutory interpretation—text, structure, purpose, and legislative history.'" *In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019) (quoting *Tax Analysts v. IRS*, 350 F.3d 100, 103 (D.C. Cir. 2003)). Our analysis begins with discerning "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). We read statutory text in light of the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id*. at 101 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

HHS has not requested judicial deference to its interpretation of the Medicare statute. *Cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984). We need not decide the significance (if any) of that omission because Cares does not ask us to "impose a particular reading of" an ambiguous statute on HHS, *Am. Ass'n of Retired Persons v. EEOC*, 823 F.2d 600, 605 (D.C. Cir. 1987), but only that we follow the statute's plain meaning, which Cares contends "require[s]" HHS to ensure that Part D prescription drug plans reimburse FQHCs for dispensing drugs at a rate "not less than" those plans reimburse other providers for the same drugs, Appellant's Br. 16. Cares never asserts that it prevails even if the statute permits HHS' reading, instead resting its APA claim on the statute's "unambiguous[]" directive. Am. Compl. ¶ 49 (A. 25). Under its own framing, Cares must show that the statute not only permits but requires HHS to enforce the Not Less Than Provision against prescription drug plans; if we decide that the statute is ambiguous and permits HHS' inaction, we need not resolve the ambiguity or definitively interpret the statute. As Cares acknowledges, Oral Arg.

Rec. 13:35-46, the statute—with its inconsistent language and many cross-references—is not a model of clarity, so any argument that it clearly forecloses HHS' interpretation has an uphill climb.

Cares' contention that the Not Less Than Provision unambiguously applies to prescription drug plans' reimbursement of FQHC pharmacy services hinges on two arguments: First, that the "services" to which the Not Less Than Provision applies include pharmacy services and, second, that the Part D Rewording Provision, 42 U.S.C. § 1395w-151(b), rewrites the Not Less Than Provision—including its internal cross-reference to the Written Agreement Provision specifying Part C written agreements—to apply to prescription drug plans. Cares must succeed on both arguments in order to prevail, showing that each of its interpretations is not only "possible" but "inevitable." *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998).

Cares' first argument would appear to have merit, given that the Medicare statute does not define the specific phrase the Not Less Than Provision uses—"services provided by such [FQHC]." 42 U.S.C. § 1395w-27(e)(3)(A). That undefined phrase's "ordinary meaning" encompasses pharmacy services, *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011), not least because Congress authorizes FQHCs to provide such services, *see* 42 U.S.C. § 254b(b)(1)(A)(i)(V). To be sure, the phrase "services provided by such [FQHC]" closely resembles the term "[FQHC] services," and the Medicare statute's definitions section specifies that "[FQHC] services" exclude prescription drugs. *Id*. § 1395x(aa)(3). But "we have repeatedly held that where different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings" even if they "can be used interchangeably." *Vonage Holdings Corp. v. FCC*, 489 F.3d

1232, 1240 (D.C. Cir. 2007) (alteration omitted). We thus diverge from the district court in holding that the statutory phrase "services provided by such [FQHC]" does not necessarily equate to the defined term, "[FQHC] services," so cannot alone defeat Cares' position that the Not Less Than Provision covers prescription drugs.

On the other hand, the fact that the Written Agreement Provision's heading contains the narrower, defined term "[FQHC] services" even as that Provision's text refers to "services from a[n FQHC]," 42 U.S.C. § 1395w-23(a)(4), lends support to HHS' position that the subtly different descriptions of "services" in the wraparound payment scheme may all be read as equivalent to "[FQHC] services." The Written Agreement Provision's interchangeable use of "[FQHC] services" and "services from a[n FQHC]"—an arguably broader, undefined term closely resembling the Not Less Than Provision's "services provided by such [FQHC]," *id.* § 1395w-27(e)(3)(A)—"suggests an inadvertent drafting inconsistency" in how the three Medicare Modernization Act provisions describe the "services" to which wraparound payments apply. *Montana v. Clark*, 749 F.2d 740, 751 (D.C. Cir. 1984). Contrary to Cares' position, the different wording thus may not after all reflect "a deliberate policy choice" to expand the range of services that the Not Less Than Provision covers. *Id.*

With various textual clues supporting and undermining Cares' first argument, it is not readily apparent that the "services provided by such [FQHC]" subject to the "not less than" mandate necessarily encompasses a broader range of services than the "[FQHC] services" term that Medicare defines to exclude prescription drugs. We need not ultimately decide whether "services provided by such [FQHC]" must mean something more than "[FQHC] services," however,

because Cares does not clear a second obstacle. It fails to establish that the Not Less Than Provision necessarily applies to Part D prescription drug plans' reimbursements to FQHCs. Spelling out the revisions that the Part D Rewording Provision dictates, *see* 42 U.S.C. § 1395w-151(b), the version of the Not Less Than Provision that would apply to Part D is as follows:

> A contract under [the Part D Contract Provision, *id.* § 1395w-112(b)] with [a prescription drug plan sponsor] shall require the [prescription drug plan sponsor] to provide, in any written agreement described in [the Written Agreement Provision, *id.* § 1395w-23(a)(4)] between the [prescription drug plan sponsor] and a[n FQHC], for a level and amount of payment to the [FQHC] for services provided by such health center that is not less than the level and amount of payment that the [prescription drug plan] would make for such services if the services had been furnished by a[n] entity providing similar services that was not a[n FQHC].

*Id.* § 1395w-27(e)(3)(A). As Cares reads it to apply in Medicare Part D, the Not Less Than Provision requires CMS to ensure that the agreements referenced in the Written Agreement Provision—which, again, are contracts between FQHCs and Medicare Advantage insurers for Part C coverage—stipulate that prescription drug plans' payments for drugs supplied by FQHCs to their patients are "not less than" payments to non-FQHCs for the same drugs, regardless of the 340B discount. Cares' Part D version of the Not Less Than Provision raises the question whether a prescription drug plan sponsor and an FQHC providing prescription drug services have the "written agreement" described in Part C that is the sole vehicle through which the "not less than" payment requirement applies. The Not Less Than Provision would have to appear in

a qualifying written agreement in order to bar prescription drug plans like Humana's from reimbursing FQHCs like Cares less for 340B discounted drugs than the plans would reimburse non-FQHCs for the same drugs obtained without that discount.

Critically, Cares never explains how the "written agreement described in" Part C's Written Agreement Provision, *id*. § 1395w-23(a)(4), covers Part D prescription drugs or even exists between prescription drug plans and FQHCs. Instead, Cares seems to assume that the Written Agreement Provision refers to contracts between Medicare Advantage insurers and FQHCs for "FQHC services" that, as already discussed, the Medicare statute defines to exclude prescription drugs. Reply Br. 6. Cares' argument is thus missing a necessary link—that the "written agreement" required for implementation of the "not less than" payment floor covers prescription drug plans' reimbursements to FQHCs under Medicare Part D. Perhaps the Pharmacy Provider Agreement between Cares and Humana could be the same "agreement" referenced in the Written Agreement Provision between a Medicare Advantage "organization" and an FQHC for "[FQHC] services," but Cares does not so contend, nor does it identify any other agreement between insurers and providers through which the "not less than" FQHC-payment requirement applies in the Part D context.

Rather than grapple with the Not Less Than Provision's reference to Part C's "written agreement," Cares argues that the Part D Contract and Rewording Provisions, 42 U.S.C. §§ 1395w-112(b)(3)(D), 1395w-151(b), implicitly remove (for purposes of Part D) that cross-reference. Cares notes in support that neither the Part D Contract Provision, which applies the Not Less Than Provision to Part D, nor the Part D Rewording Provision, which explains how to read certain language in Part C provisions when they apply to Part D, expressly

connects the Not Less Than Provision to the Written Agreement Provision. Reply Br. 6-7. That fact cannot help Cares because Part D's failure to address the Not Less Than Provision's reference to the Written Agreement Provision leaves intact duly enacted statutory language linked only to Part C. Even Cares' own description of how Part D revises the Not Less Than Provision retains the Part C "written agreement" cross-reference. *See* Appellant's Br. 26-27; Reply Br. 1.

If anything, Cares' argument cuts the other way: Part D's failure to revise the Not Less Than Provision's reference to a "written agreement" contrasts with the Part D Rewording Provision's revision of any reference to a "contract" between CMS and a Part C Medicare Advantage organization to also encompass a contract between CMS and a Part D prescription drug plan sponsor. 42 U.S.C. § 1395w-151(b)(3). And Cares identifies no Part D provision that applies the Written Agreement Provision to Part D as the Part D Contract Provision at least appears to do for the Not Less Than Provision itself. *Id*. § 1395w-112(b)(3)(D). Because "Congress include[d] particular language" to expand the meaning of "contract" for Part D purposes, we must "presume[] that Congress act[ed] intentionally and purposely" in not revising the Not Less Than Provision's neighboring use of "written agreement" or otherwise adapting the Written Agreement Provision to Part D. *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991). In short, Cares cannot "require us to read words out of the statute," *Barber v. Thomas*, 560 U.S. 474, 490 (2010), and ignore the Not Less Than Provision's unaltered, limiting reference to a "written agreement described in" the Written Agreement Provision.

Cares also invokes the canon against surplusage to argue that, unless we read the Part D Contract and Rewording Provisions to expand the Not Less Than Provision's

application, we impermissibly render those provisions "void and inoperative." Appellant's Br. 24. An important guide to interpreting statutes, the canon against surplusage ensures "that effect is given to all [statutory] provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). The Part D Contract Provision expressly states that the Part C subsection (section 1395w-27(e)) that includes the Not Less Than Provision "shall apply" to CMS' contracts with Part D insurers, 42 U.S.C. § 1395w-112(b)(3)(D), yet HHS acknowledges that the "not less than" requirement has no "practical" effect on reimbursements paid under Part D, Medicare Program; Medical Loss Ratio Requirements for the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 78 Fed. Reg. 31,284, 31,285 (May 23, 2013). While HHS's reading raises surplusage concerns, those concerns are somewhat reduced because the Part D Contract Provision indisputably has "practical effect" on other provisions within the named subsection, including on both provisions that predate Part D's enactment. *See* 42 U.S.C. § 1395w-27(e)(1)-(2); MMA §§ 101(a)(2), 237(c), 117 Stat. at 2100, 2213. Those preexisting provisions may have been the intended target of the Contract Provision, and its effect on the contemporaneously enacted Not Less Than Provision may have been overlooked.

Even assuming that Cares has identified a superfluity problem, the canon against surplusage changes our analysis only if Cares offers a "competing interpretation [that] gives effect to every clause and word of [the] statute." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (quoting *Microsoft Corp. v. i4i LP*, 564 U.S. 91, 106 (2011)). As already discussed, however, Cares' interpretation requires omitting the phrase "in any written agreement described in" the Written Agreement Provision from the Not Less Than Provision.

42 U.S.C. § 1395w-27(e)(3)(A). Accordingly, the canon against surplusage—which, after all, "is not an absolute rule," *Marx*, 568 U.S. at 385—does not unambiguously require Cares' reading of the statute.

To complement its textual arguments, Cares reasons that unless the Not Less Than Provision applies to prescription drug plans' reimbursements to FQHCs, insurers may capture through lower reimbursement rates the discounts that Congress required pharmaceutical manufacturers to provide FQHCs (and other eligible providers) under Section 340B. From a policy perspective, Cares' position is "intuitive enough," *Cares Cmty. Health*, 346 F. Supp. 3d at 130: If Congress enacted both Medicare wraparound payments and Section 340B drug discounts to help fund FQHCs' provision of uncompensated care to low-income, uninsured patients, then Congress may have intended that both benefits remain with FQHCs rather than redound to insurers' benefit in the form of lower reimbursements. Even as it opposes Cares' reading of the Not Less Than Provision, HHS acknowledges that the savings that prescription drug plans extract by paying less for 340B pharmacy services do not appear to pass through to CMS. Oral Arg. Rec. 20:47-21:29.

It may be, as Cares contends, that FQHCs are underfunded relative to insurers offering Medicare prescription drug plans and that FQHCs' service mission in medically underserved communities significantly relies on the funding stream they get from full-price insurance reimbursements for their provision of discounted drugs. But "[e]ven if we were persuaded that [Cares] had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our primary guide to Congress' preferred policy." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017). At bottom, Cares never offers an interpretation of the Medicare statute that

unambiguously protects the revenue FQHCs generate from combining manufacturers' pharmaceutical discounts under Section 340B with insurance reimbursements pegged to market prices.

Because the statute does not require Cares' reading, it permits HHS to interpret the Not Less Than Provision as preventing insurers from exploiting the wraparound subsidy payments, but not protecting FQHCs' ability to generate revenue from market-price reimbursements for dispensing drugs they acquire at a discount under Section 340B. Part D does not alter the directive that the "not less than" requirement be "provide[d] in any written agreement described in the" Part C Written Agreement Provision. 42 U.S.C. § 1395w-27(e)(3)(A). Without explaining how the "written agreement" that implements the Part C wraparound payment scheme applies in the Part D context, Cares cannot carry its burden to show that the Not Less Than Provision unambiguously applies to prescription drug plans' reimbursement of the pharmacy services that FQHCs provide to Medicare beneficiaries.

*   *   *

The Medicare statute does not preclude HHS from approving prescription drug plans that lower reimbursements for FQHC pharmacy services based on whether the FQHC obtained the pharmaceuticals at a discount under Section 340B. We need not and do not decide whether the statute permits the contrary interpretation Cares advances or whether, as a matter of policy, HHS might promulgate regulations requiring Medicare prescription drug plans to include a "not less than" term in their agreements with FQHCs to secure to FQHCs broader financial benefits from 340B drug discounts. Whatever the merits of Cares' preferred method of distributing

the savings FQHCs enjoy under Section 340B, Cares has not shown that the statute requires that approach.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered*.